[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15988

_____

D.C. Docket No. 0:10-cv-61813-DLG

MICHAEL P. BRANNON, PSY.D., individually; MICHAEL P. BRANNON,
PSY.D., P.A., a Florida professional services corporation; and THE INSTITUTE
FOR BEHAVIORAL SCIENCES AND THE LAW, LLC, a Florida limited liability
company,

Plaintiffs-Appellants,

versus

HOWARD FINKELSTEIN, in his official capacity as Broward County Public
Defender,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 18, 2014)

Before MARCUS, DUBINA, and WALKER,[*] Circuit Judges.

_____

[*] Honorable John M. Walker, Jr., United States Court of Appeals for the Second Circuit, sitting by
designation.

WALKER, Circuit Judge:

Plaintiff Michael P. Brannon filed suit in the district court alleging that defendant Howard Finkelstein reduced and ultimately terminated Brannon's consulting work as a forensic psychologist for the Broward County Public Defender's office in retaliation for Brannon's constitutionally protected testimony about a Florida state court judge. The United States District Court for the Southern District of Florida (Donald L. Graham, *Judge*) granted summary judgment to the defendant. We VACATE in part, AFFIRM in part, and REMAND.

## BACKGROUND

We are mindful that this case comes before us on an appeal from a grant of summary judgment in favor of the defendant and that the facts must be taken in the light most favorable to the plaintiff. *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Michael Brannon is a forensic psychologist and the sole owner of Michael P. Brannon, Psy.D., P.A., which owns fifty percent of the Institute for Behavioral Sciences and the Law, LLC (collectively, the "plaintiffs"). The other fifty percent is owned by Brannon's business partner, Dr. Sherrie Bourg Carter. Until 2009, plaintiffs performed forensic psychology work for the office of the Broward County Public Defender, Howard Finkelstein.

On December 6, 2007, Brannon testified before the Florida Judicial

Qualifications Committee that was convened to investigate charges that the Hon. Cheryl Aleman had mistreated a criminal defendant appearing before her. Brannon testified in Judge Aleman's favor to the effect that she was never hostile to him during his appearances before her as a witness. The parties do not dispute that this testimony is protected speech under the First Amendment.

Although Finkelstein was not present during the Aleman hearing, he testified that he was "surprised" and "extremely disappointed" upon learning of Brannon's testimony. Shortly after the Aleman hearing, Finkelstein ran into Michael Gottlieb, a private attorney who worked with Brannon. Gottlieb testified that Finkelstein "expressed dissatisfaction" with Brannon's testifying on Judge Aleman's behalf because Finkelstein felt, as Gottlieb put it, that nobody from the defense community should "support such a person who was essentially a prosecutor in a robe." Gottlieb testified that "people thought of Judge Aleman as an evil witch," but he did not ascribe this statement to Finkelstein. According to Gottlieb, his conversation with Finkelstein was centered on "how could anybody testify on behalf of that evil witch."

Gottlieb "quickly" called Brannon to tell him what Finkelstein had said because, as Gottlieb put it, Gottlieb was concerned that Finkelstein was going to curtail Brannon's work. Brannon testified that after speaking to Gottlieb, he felt that he was "being or going to be discriminated against." After Brannon's

3

testimony at the Aleman hearing, Finkelstein stopped exchanging pleasantries with Brannon and Bourg Carter.

Following his December 2007 testimony about Judge Aleman, Brannon's practice received less consulting work from the Public Defender's office. In fiscal year 2006-2007, plaintiffs were paid $608,757.50 by the Public Defender's office; in fiscal year 2007-2008, they were paid $390,212.00; and in 2008-2009, the first full fiscal year following Brannon's testimony at the Aleman hearing, plaintiffs were only paid $170,612.00. During this period, however, the Public Defender's office was sharply reducing its budget for hiring mental health experts. Over the four fiscal years running from July 2005 to June 2009, Brannon received roughly the same portion of the total budget spent by the Public Defender's office to hire mental health experts: 28.2%, 31.32%, 29.26%, and 30.35%, respectively.

Brannon also testified that starting in December 2007, following his testimony at the Aleman hearing, he had troubling conversations with at least six Assistant Public Defenders who in the past had routinely hired him. Although Brannon could not remember the exact words used, he testified that the substance of their remarks was that the Public Defender's office was angry at him and that, whereas previously any assistant Public Defender could hire him, now they could not hire him without approval from Finkelstein's top assistants. Brannon testified, however, that these Assistant Public Defenders were not told directly by Finkelstein

that Brannon was being disfavored because of his testimony at the Aleman hearing. Additionally, Bourg Carter testified that Melisa McNeill, an Assistant Public Defender, said sometime "after the Aleman testimony" but "way before" the present lawsuit was filed in September 2010 that she had been told that she could not hire Bourg Carter or Brannon "because of what was going on with Dr. Brannon."

As of March 1, 2009, the Public Defender's office began using a wheel rotation system to hire mental health experts instead of allowing Assistant Public Defenders to directly retain experts. Brannon testified at deposition that he thought that the wheel rotation system "was a horrific idea that reinforces mediocrity," and that "shortly after [it] was put in," he freely shared this opinion with "[e]very single person that would listen." On June 23, 2009, while being deposed in a case against Barnard Joseph, a client of the Public Defender's office, Brannon gave testimony that was critical of the Public Defender's office for putting in the wheel rotation system because it risked reducing his referral work. He also took issue with the demotion of an Assistant Public Defender from his position as head of homicide.

On July 7, 2009, in response to Brannon's concerns, Finkelstein told Brannon in an email that Brannon was included in the wheel rotation system. On the same day, however, Finkelstein sent an email to one of his top assistants stating that Finkelstein wanted Brannon to professionally suffer "death by [] 1000 invisible

5

cuts. [W]ithering on the vine, pinned and wriggling on the wall with no target or issue or martyrdom for him to seek sanctuary."

On July 28, 2009, after reviewing Brannon's testimony at the Joseph deposition, Finkelstein ordered that Brannon be removed from the wheel rotation system because of his demonstrable hostility and animosity toward the Public Defender's office. Finkelstein testified that Brannon's testimony in the Joseph deposition was the basis for his decision. As a result, in fiscal year 2009-2010, plaintiffs received only $12,800 of consulting work from the Public Defender's office.

On September 29, 2010, the plaintiffs filed this suit in the District Court for the Southern District of Florida, alleging that Finkelstein reduced and ultimately terminated Brannon's consulting work for the Public Defender's office in retaliation for Brannon's constitutionally protected speech at the Aleman hearing. On October 16, 2012, the district court granted summary judgment to defendants. *Brannon v. Finkelstein*, No. 10-cv-61813-DLG (S.D. Fla. Oct. 16, 2012), ECF No. 137. In substance, the district court concluded that the Public Defender's office had not taken any adverse action against Brannon prior to removing him from the wheel rotation system and that there was no causal nexus between that removal in July 2009 and Brannon's testimony at the Aleman hearing in December 2007. *Id*.

Plaintiffs appeal.

## DISCUSSION

### I.    Summary Judgment

We review a district court's ruling on summary judgment *de novo* and apply the same legal standard used by the district court.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (per curiam).  "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"  *Id.* (alteration in original) (quoting Fed. R. Civ. P. 56(c)).  In making this determination, "[w]e draw all factual inferences in a light most favorable to the non-moving party."  *Id.*

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech."  *Castle v. Appalachian Technical Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).  Because the parties do not dispute that Brannon's testimony at the Aleman hearing was constitutionally protected, we must determine whether, taking the evidence in the light most favorable to Brannon, a fair-minded jury could conclude that Brannon suffered adverse conduct and that there was a causal relationship

7

between the adverse conduct and his Aleman testimony.

### A.    Adverse Conduct

Finkelstein does not dispute that removing Brannon from the wheel rotation system in 2009 amounted to adverse conduct.  Finkelstein argues, however, that Brannon's lost work immediately following his testimony at the Aleman hearing cannot amount to adverse conduct because of the overall budget reductions that took place.  We do not believe that this issue can be resolved in Finkelstein's favor on summary judgment.

Brannon has established that his total work from the Public Defender's office dropped from the 2006-2007 fiscal year ($608,757.50) to fiscal years 2007-2008 ($390,212.00) and 2008-2009 ($170,612.00).  Brannon's work from the Public Defender's office thus decreased approximately 72% over the course of two fiscal years.  This is plainly not a "trivial" or "*de minimus* inconvenience" to Brannon.  *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005).

Finkelstein points to the budget reductions as obviating Brannon's claim of adverse conduct; but that conflates the issue of adverse conduct with its cause.  At this step, we need not ask whether the reduction in Brannon's work was caused by Brannon's protected speech or by the budget reductions.  All we need conclude, as we do here, is that a jury could find that such a drastic decrease in business, if it

resulted from retaliation, "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254.[1]

## B.    Causation

As relevant here, causation asks whether Finkelstein, in taking actions that were adverse to Brannon, was subjectively motivated either to reduce Brannon's work beginning in 2007 or to remove Brannon from the wheel rotation system in July 2009 because Brannon engaged in constitutionally protected speech by testifying at the Aleman hearing. *See Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). This subjective motivation issue is addressed through the *Mt. Healthy* burden-shifting analysis:

> [O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on [his motion for judgment as a matter of law or prior to trial on] summary judgment.

*Id.* (second alteration in original) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

---

[1] The district court also granted summary judgment to the defendant on Brannon's claim that the Public Defender's office objected to Brannon being appointed by the state court or hired by the State Attorney's office in cases involving clients of the Public Defender's office. *Brannon v. Finkelstein*, No. 10-cv-61813, slip op. at 13 (S.D. Fla. Oct. 16, 2012). Construing the arguments in Brannon's brief liberally, Brannon has not raised this issue on appeal and he is thus deemed to have abandoned it. *See Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994).

### 1. Reduction in work beginning in 2007

Brannon contends that Finkelstein was subjectively motivated to reduce his work because of his testimony at the Aleman hearing. In support, Brannon points to Finkelstein's testimony that he was "surprised" and "extremely disappointed" at Brannon's testimony at the hearing. There was also evidence that months later, Finkelstein admitted in an email that he wanted Brannon to suffer "death by [] 1000 invisible cuts," which could be interpreted to relate back to reductions in his referral work.

Brannon received substantially more work from the Public Defender's office during July through December of 2007, when he received $288,875, as compared to the first six months in 2008 immediately following his testimony at the Aleman hearing, when he received only $125,792.50. The record also establishes that in the eleven months prior to Brannon's testimony at the Aleman hearing, Brannon's office received on average $47,448 of work per month from the Public Defender's office, while in the twelve months following his testimony, the monthly average dropped to $19,418. Where adverse action "closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse action." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 745 (11th Cir. 1996).

Finkelstein argues that, even if these numbers are accurate, his office

10

drastically curtailed its budget for hiring expert witnesses like Brannon during this period of time and reduced Brannon's work in proportion to the overall reductions. Over the four fiscal years running from July 2005 through June 2009, Brannon continued to receive approximately the same portion of the office's total spending on due process mental health experts: 28.2%, 31.32%, 29.26%, and 30.35%, respectively. In other words, Brannon's share of the Public Defender's office's work following his testimony at the Aleman hearing in December 2007 until he was removed from the wheel in July 2009 remained about the same. Finkelstein thus contends that Brannon's work would have been reduced regardless of Brannon's Aleman hearing testimony.

We believe that, based on the evidence in the record, a reasonable fact-finder could find that Finkelstein was subjectively motivated to reduce and did reduce Brannon's work because of his Aleman hearing testimony. On the other hand, a reasonable fact-finder could, but would not be required to, find that Finkelstein would have reduced Brannon's work in any event because of the Office's budget reductions. *See Smith*, 532 F.3d at 1279 (holding that summary judgment was appropriate where a jury "would have to find that the defendants would have [taken the adverse conduct] even in the absence of the protected conduct" (internal quotation marks omitted)). With two permissible views of this evidence, summary judgment was improperly granted to the defendant.

11

## 2.  Removal from the wheel rotation system in 2009

Brannon argues that his testimony at the Aleman hearing was also a motivating factor behind Finkelstein removing him from the wheel rotation system in 2009.  Three pieces of evidence support Brannon's argument.

First, Brannon testified at deposition that shortly after the Aleman hearing at least six Assistant Public Defenders told him that they could not retain him as an expert because Finkelstein was angry at Brannon.  Brannon testified that they told him that whereas he could previously be retained by any Assistant Public Defender, now he could not be hired without approval from Finkelstein's top assistants.  Although Brannon could not recall the specific words used in each conversation, he recalled the names of the Assistant Public Defenders with whom he spoke.[2]

Second, Bourg Carter testified that Assistant Public Defender Melisa McNeill said sometime "after the Aleman testimony" but "way before" this lawsuit was filed in September 2010 that she had been told that she could not hire Bourg Carter or Brannon because of the animosity the Public Defender's office had toward Brannon.

---

[2] Even if Brannon's testimony regarding what the Assistant Public Defenders told him is hearsay, as the district court found, it should be considered on summary judgment here because it can be reduced to an admissible form at trial.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (stating that the "most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial").

12

Third, as noted earlier, on July 7, 2009, three weeks before Brannon's removal from the wheel, Finkelstein said in an email to one of his employees that he wanted Brannon to professionally suffer "death by [] 1000 invisible cuts. [W]ithering on the vine, pinned and wriggling on the wall with no target or issue or martyrdom for him to seek sanctuary."

Notwithstanding this evidence, Finkelstein argues that he would have removed Brannon from the wheel regardless of Brannon's Aleman hearing testimony because Brannon publicly had expressed animosity towards the Public Defender's office.  Brannon admitted at deposition that, "shortly after the wheel system" was implemented in March 2009, he publicly criticized the Public Defender's office's use of the wheel, calling it a "horrific idea that reinforces mediocrity" because it "makes an assumption that everybody who has . . . a Ph.D. or Psy.D. is of equal skill and talent in all areas.  We all know that's not the truth." Brannon further testified that he expressed this opinion to "[e]veryone who would listen.  Both chief judges. . . . Every single person that would listen to me." Moreover, on June 23, 2009, Brannon testified in a deposition related to a case against a client of the Public Defender's office, Barnard Joseph, that he had concerns with the office, including that he was receiving less work under the wheel rotation system and that he disagreed with the demotion of an Assistant Public Defender from the position as head of homicide.

13

We reject Brannon's contention that his statements made against the Public Defender's office's policies cannot be used to justify removal from the wheel because he was provoked by Finkelstein into making them. Brannon relies on *NLRB v. Mueller Brass Co.*, where the Fifth Circuit stated that "[a]n employer cannot provoke an employee to the point where she commits such an indiscretion . . . and then rely on this to terminate her employment." 501 F.2d 680, 686 (5th Cir. 1974). Although there is evidence here that Finkelstein was personally hostile to Brannon, there is no evidence that the Public Defender's office provoked him prior to the statements he made against the office's policies. Brannon spoke freely and without provocation when he testified at the Joseph deposition and when he criticized the wheel system starting in March 2009 to "[e]veryone who would listen."

Finkelstein argues that Brannon was treated no worse from the time of the Aleman hearing to the Joseph deposition and that no decision was made to remove Brannon from the wheel prior to July 28, 2009, the date that Finkelstein reviewed Brannon's testimony at the Joseph deposition.

As with Brannon's reduced referral work discussed above, we believe that a reasonable fact-finder could come to different conclusions as to why Brannon was removed from the wheel. Finkelstein could have removed Brannon from the wheel solely because of Brannon's disparaging remarks about the Public Defender's office

14

regardless of his protected testimony at the Aleman hearing and any consequent hostility that Finkelstein harbored. *See Castle*, 631 F.3d at 1197 (defendant is not liable if he "would have taken the same action in the absence of the protected conduct"). On the other hand, a reasonable jury could find that Brannon's testimony at the Aleman hearing caused the removal. We thus conclude that, as to Brannon's removal from the wheel rotation system, summary judgment was improperly granted to Finkelstein.

## II.    Qualified Immunity

Prior to ruling on defendant's motion for summary judgment, the district court granted qualified immunity to Finkelstein in his individual capacity on Brannon's claim that Finkelstein violated his constitutional rights by reducing and ultimately terminating his work as an expert witness for the Public Defender's office. *Brannon v. Finkelstein*, No. 10-cv-61813 slip op. at 11 (S.D. Fla. Oct. 3, 2011), ECF No. 30. The district court held that the balancing of interests of the employee versus the State employer required by *Pickering v. Board of Education*, 391 U.S. 563 (1968), would not conclusively show that Finkelstein deliberately violated Brannon's First Amendment rights. This was so because Finkelstein could reasonably believe that Brannon was biased against the Public Defender's office and thus "may very well have reasonably believed that legal ethics required his actions." *Brannon*, ECF No. 30, slip op. at 11.

15

We affirm the grant of qualified immunity. We do so, however, on somewhat different grounds because we now have the benefit of discovery unavailable to the district court at the motion to dismiss stage.

"Qualified immunity provides protection for government officials performing discretionary functions and sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003) (internal quotation marks omitted). Put another way, the official is entitled to such immunity unless he both (1) violates clearly established law and (2) was aware or reasonably should have been aware that he was doing it.

First, the court must be convinced "that the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or the law clearly proscribed the actions the defendant took." *Dartland v. Metro. Dade Cnty.*, 866 F.2d 1321, 1322 (11th Cir. 1989) (internal quotation marks and alterations omitted). And, second, we ask "whether a *reasonable person* in the position of the defendant would have known that he was violating clearly established law." *Hansen v. Soldenwagner*, 19 F.3d 573, 578 (11th Cir. 1994).

In the context of a First Amendment retaliation claim, we have recognized that a defendant "will only rarely be on notice that his actions are unlawful"

16

because applying the *Pickering* balancing "involves legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules." *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000) (internal quotation marks and alteration omitted). Likewise, in determining contested issues of causation, the defendant is entitled to qualified immunity "[w]here the facts assumed for summary judgment purposes . . . show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor." *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996).

As we have noted earlier, when Brannon's work was reduced following his testimony at the Aleman hearing, the Public Defender's office simultaneously drastically reduced its overall budget for hiring expert witnesses like Brannon. The evidence also suggests that while Brannon's referrals dropped in absolute terms, his proportional share of the Public Defender's office's work remained constant. And it is not disputed that, when Finkelstein removed Brannon from the wheel rotation system, Brannon had recently and publicly expressed his ill-will towards the Public Defender's office. Brannon was thus susceptible to cross-examination on the subject whenever he testified on a Public Defender's client's behalf, which in turn could compromise the effectiveness of his testimony.

Under the specific facts and circumstances of this case, in which there exists evidence of both lawful and unlawful motivations for Finkelstein's actions, "pre-

17

existing law does not dictate that the merits of the case must be decided in [Brannon's] favor."  *Id*.  Thus Finkelstein is entitled to qualified immunity in his individual capacity on the retaliation claim.

## **CONCLUSION**

For the reasons stated above, we VACATE the judgment of the district court granting summary judgment to the defendant, AFFIRM the judgment of the district court granting qualified immunity to defendant Finkelstein in his individual capacity, and REMAND for further proceedings consistent with this opinion.