[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11643
Non-Argument Calendar

_____

D.C. Docket No. 2:13-cv-00495-CG-M


WILLIAM SMITH,

Plaintiff-Appellant,

versus

CITY OF GREENSBORO,
CHIEF WILLIE HUDSON,
MAYOR JOHNNIE WASHINGTON,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Southern District of Alabama

_____


(April 12, 2016)

Before JORDAN, JULIE CARNES and JILL PRYOR, Circuit Judges.

PER CURIAM:

William Smith, a black male, appeals from the district court's grant of summary judgment in favor of defendants the City of Greensboro (the "City"), Chief of Police Willie Hudson, and Mayor Johnnie Washington on his employment discrimination claims under the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964. After consideration of the parties' briefs and a thorough review of the record, we affirm.

## I. BACKGROUND[1]

From 2006 through December 20, 2012, William Smith worked as a City police officer. During this time, he worked only the night shift, which allowed him also to work as a school bus driver during the day.

In September 2010, the City Council appointed Willie Hudson as Chief of Police. Virtually from the start, Hudson and Smith had a tense relationship. For example, in January 2011, Hudson met with Smith to address problems with Smith's performance. Hudson memorialized the meeting in a "Letter of Counseling," which he provided to Smith. In the letter, Hudson noted, among other issues, that Smith was difficult to reach when he was off duty.

---

[1] On review of the district court's grant of summary judgment, we recount the facts in the light most favorable to Smith. *See infra* Part II.

2

Shortly after this meeting, on February 12, 2011, Smith drafted a letter to "whom it may concern," reflecting on the conflicts he had with Hudson. In the letter, Smith stated that Hudson was bullying him, threatening to "put [him] on all days so [he could not] drive [his] bus route." Doc. 30-25 at 11.[2] Smith also complained specifically about the January meeting and Letter of Counseling, asserting that Hudson unfairly singled him out. Smith then requested a hearing before the City's Grievance Committee to address Hudson's alleged harassment. The Grievance Committee held a hearing on March 1, 2011. The record does not reflect the outcome of this hearing.

Beginning in the spring of 2012, the City's black incumbent mayor Johnnie Washington ran for reelection against a white man, Stephen Gentry, and a black man, Eldrin Long. Chief Hudson warned Smith and other officers that any black officer who supported the white political leadership in the City would suffer negative consequences. At some unidentified point in time, Smith complained about this remark and generally about Hudson's "racial politics" to Assistant Chief Mike Hamilton.

Washington and Gentry garnered nearly an equal number of votes in the August 2012 general election, sending the contest to a run-off election scheduled for October 9, 2012. Smith then began supporting Gentry. During the

---

[2] Citations to "Doc." refer to docket entries in the district court record in this case.

campaigning leading to the run-off election, Smith and Willie Lewis, his colleague on the police force, vocalized support for Gentry to other officers, including Assistant Chief Hamilton, and to members of the community including Hamilton's brothers, Terry Hamilton and former Chief of Police Claude Hamilton.  Smith and Lewis never made political statements at work, and Chief Hudson and Mayor Washington maintain that they were unaware of Smith's political allegiance to Gentry.[3]

At some point between the August election and October run-off, Smith received a letter from Chief Hudson telling him that he could no longer work exclusively night shifts.  At least by this point, Smith was the only officer not serving on rotating day and night shifts.  Smith immediately contacted Mayor Washington and Chief Hudson and urged them to reverse this decision, explaining that he needed both jobs to support his family.  He then met with Hudson and Assistant Chief Hamilton to reiterate his request.  Hudson refused, citing "miss[ed] court dates, neglect[ed] papework," and Smith's unavailability by telephone.  Doc. 38-1 at 6, ¶ 17.  According to Smith, he never missed court dates and Chief

---

[3] Smith asserts that the City targeted him and Lewis for their support of Gentry.  To support this assertion, Smith relies on statements he says he heard Terry Hamilton and Assistant Chief Hamilton make.  Before the district court, the defendants challenged these statements as inadmissible hearsay, but they make no such challenge on appeal.  In any event, because Smith failed to show that the City could be liable for any adverse employment action he allegedly suffered, *see infra* note 8, we need not address whether the City harbored a retaliatory intent and thus do not consider these remarks.

Hudson "always knew how to reach [him] because he knew where [he] lived and had all of [his] contact numbers." *Id.*

Mayor Washington won the run-off election on October 9, 2012. In November, Chief Hudson informed Smith that he was being placed in the shift rotation to work days as well as nights.

In late November 2012, Smith took paid leave, returning to work the first week of December with a physician's excuse. The excuse stated that Smith had visited the doctor on December 4 and should be excused from work for six weeks. The City Attorney[4] responded on December 13, noting that the City understood he was continuing to work as a bus driver during his leave of absence from the police department. Thus, the City Attorney requested additional information from the doctor explaining why Smith could work as a bus driver but not as a police officer. Smith responded with a nearly identical physician's note, providing no additional information. Smith subsequently stopped reporting to work. On December 20, the City Attorney informed Smith that his medical excuse was insufficient and that the City considered him "as having abandon[ed] and/or resigned [his] position." Doc. 30-7 at 2. Chief Hudson followed with a letter echoing this decision.

---

[4] Smith averred that he received this letter from Chief Hudson, but the record reflects that the letter came from the City's attorney, Dennis Steverson.

Smith requested and received a grievance hearing.  At the grievance hearing, the City explained that Smith had not been fired and that he could return to work if he desired.  The City Attorney followed up with a letter stating, "You were not fired nor did you receive any disciplinary action from your request for six weeks of sick leave."  Doc. 30-11 at 2.  The letter continued:

> You may return to work immediately or provide sufficient medical proof that you were medically unable to work during the six-week period that you requested for sick leave.  Your medical proof must explain why you can work at another job outside of the police department during your sick leave, but can't perform your duties at the police department.

*Id.*  Smith failed to submit the requested medical proof and did not report to work. Smith continued working as a bus driver, however.  Smith is no longer employed with the Greensboro Police Department.

Smith filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which issued a right to sue letter.  He then filed this action, alleging several claims against the City, Mayor Washington, and Chief Hudson including:  (1) a First Amendment freedom of association retaliation claim;[5] (2) a race discrimination claim under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 3; and (3) a Title VII retaliation

---

[5] It was unclear from Smith's operative amended complaint whether his First Amendment retaliation claim was based on freedom of speech or freedom of association.  On appeal, Smith argues only that the defendants violated his right to freely associate, so we address only that claim.

claim.[6]  Following a period of discovery, all three defendants moved for summary

judgment.  The district court granted the motion for summary judgment, dismissing

this action with prejudice.  This appeal followed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Galvez v.*

*Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008).  "Summary judgment is appropriate

when the evidence, viewed in the light most favorable to the nonmoving party,

presents no genuine issue of fact and compels judgment as a matter of law."

*Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1050 (11th Cir. 2008); *accord* Fed. R.

Civ. P. 56(a).  If the nonmoving party bears the ultimate burden of proof regarding

the claim at issue in the summary judgment motion, that party, in response to the

motion, must go beyond the pleadings and establish through competent evidence

that there truly is a genuine, material issue to be tried.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986).

## III. ANALYSIS

Smith argues that the district court erred in granting the defendants' motion

for summary judgment on his First Amendment freedom of association retaliation

---

[6] Smith raised several other claims including, among others, equal protection and due process claims under the Fourteenth Amendment and a state law claim of intentional infliction of emotional distress.  The district court dismissed these claims, and Smith does not challenge their dismissal on appeal.  These claims, therefore, are abandoned.  *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 (11th Cir. 2008).

claim, Title VII and § 1983 race discrimination claims, and  Title VII retaliation claim.  We first consider whether Smith can prove an adverse employment action, a necessary element of each of his claims.  Because Smith can do so only for his two retaliation claims against Chief Hudson, we next consider whether the district court erred in dismissing those two claims on summary judgment.

## A. Adverse Employment Action

To prevail on his claims, Smith must prove he suffered an adverse employment action.  *See McCabe v. Sharrett*, 12 F.3d 1558, 1563-64 & 1565 n.8 (11th Cir. 1994) (First Amendment retaliation claim); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013) (Title VII discrimination claim); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (Title VII retaliation claim and race discrimination claim under Title VII and § 1983).  Smith argues that he suffered two adverse employment actions:  a coerced resignation and a shift change.

We first reject Smith's coerced resignation argument with respect to all three of his claims.  "Under the coercion or duress theory, we consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).  Several factors guide our analysis including:  "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the

8

choice he was given; [and] (3) whether the employee was given a reasonable time in which to choose." *Id.*[7] The record shows that the City offered Smith an alternative to resignation: providing a medical reason for his inability to work as a police officer. Smith indisputably understood the choice he was given and had ample time to make it. Under these circumstances, Smith's resignation was not obtained through coercion and cannot support any of the claims here.

We next conclude that the shift change cannot support a Title VII or § 1983 discrimination claim but can constitute an adverse employment action for purposes of Smith's retaliation claims against Chief Hudson. For his race discrimination claims under Title VII or § 1983, Smith must prove that his employer took actions that materially changed the terms, conditions, or privileges of employment. *Kidd*, 731 F.3d at 1202. Smith argues that being placed on the day-shift prevented him from working his day job, but he does not argue, nor does he support with evidence, that the shift change materially altered the terms, conditions, or privileges of his employment as a police officer with the City. Thus, Smith failed to show he suffered an adverse employment action to support his race discrimination claim under Title VII or § 1983. We affirm the district court's grant of summary judgment on those claims. *See Thomas v. Cooper Lighting, Inc.*, 506

---

[7] We recognized in *Hargray* that other factors may be relevant, including "whether the employee was permitted to select the effective date of the resignation; and . . . whether the employee had the advice of counsel." *Hargray*, 57 F.3d at 1568. Neither of these factors suggests that Smith was coerced into resigning.

F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

In contrast, the shift change could support Smith's retaliation claims against Chief Hudson.[8]  "[T]he type of employer conduct considered actionable [in the retaliation context] has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related."  *Crawford*, 529 F.3d at 973 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006)); *accord Lore v. City of Syracuse*, 670 F.3d 127, 163-64 (2d Cir. 2012) ("If the adverse-action element of a Title VII retaliation action can be satisfied by an action causing the employee harm outside the workplace, *a fortiori* an act in retaliation for the employee's exercise of a constitutional right need not be tied to harm in the workplace.").  To determine whether the shift change had a materially adverse effect, we consider the totality of

---

[8] Smith offered no evidence or argument that the Mayor was involved in the shift change decision.  Nor did Smith offer any basis to hold the City liable for the shift change under *Monell* v. *New York City Department of Social Services*, 436 U.S. 658, 694 (1978).  *See Carter v. City of Melbourne*, 731 F.3d 1161, 1167-68 (11th Cir. 2013) (affirming dismissal of a First Amendment retaliation claim against a city where the plaintiff failed to offer evidence that the employment decisions about which he complained were rendered by a final policymaker for the city).  Thus, the district court did not err in dismissing Smith's retaliation claims against the Mayor and the City.

circumstances "judged from the perspective of a reasonable person in the plaintiff's position." *Burlington*, 548 U.S. at 71 (internal quotation marks omitted).

Smith produced evidence that the shift change—after his six years of working only nights—made it impossible for him to keep his day job as a bus driver, a job he needed to support his family. Based on the evidence in the record, a reasonable jury could conclude that this shift change had a "materially adverse" effect on Smith and thus constituted an adverse employment action for purposes of his two retaliation claims against Hudson. *See Crawford*, 529 F.3d at 973 n.13 ("*Burlington* also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." (quoting *Burlington*, 548 U.S. at 71)). We thus must consider whether, on this record, Smith can satisfy the remaining elements of his First Amendment and Title VII retaliation claims against Hudson. We consider each claim separately.

**B. First Amendment Retaliation Claim**

The First Amendment prohibits the state from denying its citizens the right to associate with whomever they choose. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 71-74 (1990). Accordingly, the state may not take a materially adverse action against its employee in retaliation for exercising First Amendment

11

associational rights.  *McCabe*, 12 F.3d at 1568.[9]  "[I]n cases where the employer denies taking the adverse employment action solely because the employee exercised the expressive association right of political affiliation, we . . .  employ the *Mt. Healthy* causation analysis."  *Id.* at 1565 n.8 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).  Under the *Mt. Healthy* analysis, the plaintiff must first show that "political affiliation was a substantial or motivating factor for the challenged action."  *Id.*  Once the plaintiff satisfies this burden, "the burden of production shifts to the defendant . . . [to] show that he would have taken the same action in the absence of the protected activity." *Brannon v. Finkelstein*, 754 F.3d 1269, 1275 (11th Cir. 2014) (internal quotation marks omitted).

Smith has failed to produce sufficient evidence to satisfy his initial burden. "It is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision."  *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th

---

[9] To prevail on a First Amendment retaliation claim based on freedom of association, "the plaintiff must make threshold showings (1) that the behavior at issue consists of constitutionally protected political affiliation or belief and (2) that he or she actually suffered adverse employment action before a court will consider the issue of justification."  *McCabe*, 12 F.3d at 1565 n.8.  The defendants do not contest that Smith's support for Mayor Washington's opponent was constitutionally protected, and we have already determined that Smith raised a genuine issue of material fact whether he suffered an adverse employment action for retaliation purposes.

Cir. 1995) (applying *Mt. Healthy* to a First Amendment retaliation claim based on freedom of expression).  Nonetheless, if "there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct," the plaintiff will be unable to show causation even where there is close temporal proximity between the protected conduct and adverse action.  *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (considering causation in a case under the Family Medical Leave Act).

Chief Hudson averred that he was unaware of Smith's political association with Mayor Washington's white opponent, Gentry.  Smith failed to rebut this evidence.  Although Smith maintained that he vocalized support for Gentry to other officers, including Assistant Chief Mike Hamilton and former Chief of Police Claude Hamilton, Smith offered no evidence that the Hamiltons or anyone else told Hudson about this support, or that Hudson learned of it in any other way.  Smith himself maintained that he never discussed his political affiliation at work.  Other than speculation, a reasonable jury would have no basis to find that Hudson knew about Smith's support of Gentry.  Speculation is insufficient to avoid summary judgment.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."  (internal

13

quotation marks omitted)).  Accordingly, the district court did not err in dismissing Smith's First Amendment retaliation claim against Hudson.

## C. Title VII Retaliation Claim

Last we consider Smith's Title VII retaliation claim.  In order to establish a *prima facie* case for retaliation under Title VII, a claimant may show that:  (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal link between the protected activity and the adverse action.  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  Statutorily protected activity includes (1) "oppos[ing] any practice made an unlawful employment practice by" Title VII and (2) "mak[ing] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII.  42 U.S.C. § 2000e-3(a); *see EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174-75 (11th Cir. 2000).  Smith argues that Chief Hudson retaliated against him because he "opposed the racist rantings of Chief Hudson," Appellant's Br. at 23, presumably referring to a complaint he voiced to Assistant Chief Mike Hamilton sometime in the spring of 2012.[10]  *See*

---

[10] Smith also suggests without explanation or citation to authority that his political affiliation with a white candidate for mayor was statutorily protected conduct under Title VII. Even assuming his political support for Gentry constituted statutorily protected conduct under Title VII, any claim based on this political association would fail for the reasons explained above in Part III.B.

14

Doc. 38-1 ¶ 11.  We assume without deciding that this complaint constituted statutorily protected conduct.

Smith's Title VII retaliation claim fails nonetheless because he provided insufficient evidence to draw a causal link between the complaint about Hudson's alleged racist remarks and the adverse action, his November 2012 shift change. "We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith*, 513 F.3d at 1278 (internal quotation marks omitted).  Despite this low bar, Smith neither cites record evidence nor provides any explanation to show that his complaint was related in any way to the shift change.  Just as with his First Amendment retaliation claim, to prove causation, Smith must "'show that the decision maker was aware of the protected conduct at the time of the adverse employment action.'" *Goldsmith*, 513 F.3d at 1278 (quoting *Brungart*, 231 F.3d at 799); *see, e.g.*, *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1244-45 (11th Cir. 2016) (holding that without defendant's knowledge that plaintiff engaged in protected activity, plaintiff cannot show that the activity caused the adverse employment action).  Smith offers no evidence that Hudson was aware of Smith's complaint to Mike Hamilton.  In sum, because Smith failed to proffer sufficient evidence to support causation, the district court did not err in dismissing his Title VII retaliation claim on summary judgment.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's entry of summary judgment on all claims.

**AFFIRMED.**