[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10332

_____

REVEREND STEPHEN JARRARD,

Plaintiff-Appellant,

OLLIE MORRIS,

Plaintiff,

*versus*

SHERIFF OF POLK COUNTY,
CHIEF DEPUTY AL SHARP,

Defendants-Appellees,

DEPUTY DUSTIN STROP,
Individually and in their official capacities,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:20-cv-00002-MLB

_____

Before ROSENBAUM, NEWSOM, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Stephen Jarrard is a member of the Church of Christ who successfully applied to participate in a county jail's volunteer ministry program, was later dismissed from that program, and still later unsuccessfully sought to be readmitted. He sued, claiming that his dismissal and exclusion violated his free-speech rights. The district court rejected Jarrard's First Amendment claims on summary judgment. We must decide (1) whether Jarrard's participation in the ministry program involved constitutionally protected speech, (2) whether two of the jail's policies for evaluating volunteer applications impermissibly vested decisionmakers with unbridled discretion, and (3) whether qualified immunity protects two jail officials from damages liability.

Because we hold that the two jail officials violated Jarrard's clearly established First Amendment rights, we reverse the district court's decision granting summary judgment and remand the case to that court for further proceedings on Jarrard's claims.

## I

## A

This case's factual and procedural history is long and winding but, as it turns out, important. Lots of policies and amended policies, complaints and amended complaints. Bear with us.

For nearly two decades, Stephen Jarrard served as a volunteer minister at various jails and prisons around Georgia.[1] In that role, Jarrard has explained, he could "shar[e] . . . God's word and the Gospel" with inmates. In general, he would teach a three-month survey about an assortment of biblical topics, such as faith, repentance, and baptism. Typically, during the first few minutes of each meeting, Jarrard would field questions from inmates about the previous week's lesson or issues they had been exploring. Afterwards, Jarrard would lead discussions of pertinent Bible verses, answering inmates' questions along the way. Importantly here, Jarrard thought that he needed to "get as many folks baptized into Christ . . . before Jesus returns" as he could. He believes that baptism by immersion is necessary to salvation and that, without it, a person will be condemned to Hell.

Jarrard began volunteering at the Polk County Jail in 2012. At that time, all an interested person had to do to join the volunteer ministry program was to go to the Jail and "ask and put [his] name

---

[1] Because the district court granted summary judgment against Jarrard, we recount the facts and all inferences in the light most favorable to him. *Sutton v. Wal-Mart Stores East, LP*, 64 F.4th 1166, 1168 (11th Cir. 2023).

on [a] list." Although the list had as many as 140 people on it at one point, far fewer actually participated; the record indicates, in fact, that only about 10 volunteers ever showed up. To the best of Jarrard's recollection, the Jail approved his initial application in a matter of minutes.

Jarrard encountered difficulties pretty much from the get-go. One day several months into his tenure, he was paired with a Baptist minister who objected to his teachings about baptism. That minister asked if Jarrard was suggesting that one couldn't be saved without baptism, gave the inmates his own views on the subject, and then went to the cell door and asked the guards to let him out. The following week, the leader of the volunteer ministry team confronted Jarrard about the incident and told him that he could continue in the program only if he stopped teaching about baptism. When Jarrard refused, he was kicked out.

A few months later, Jarrard sought a meeting with Johnny Moats, who had recently been elected Polk County Sheriff. Jarrard and Moats discussed the incident involving the Baptist minister as well as their own respective religious beliefs. Moats disagreed with Jarrard's views on baptism, and the meeting concluded with Moats denying Jarrard's request to re-enter the volunteer ministry program, though Jarrard couldn't recall Moats giving a reason.

About two years later, Moats allowed Jarrard to return to the program, and Jarrard participated for about a year with no issues. During that time, Jarrard performed two baptisms, seemingly without incident.

23-10332                Opinion of the Court                5

**B**

At the end of 2015, the Sheriff's Office temporarily suspended the ministry program. Then, in February 2016, Moats and Al Sharp, the facility's Chief Jailer, implemented a formal policy to govern the program and religious services at the Jail. The policy was codified in Jail Order Number 7.07, but for simplicity's sake—and because, as will become clear, the Jail promulgated so many such orders—we'll just call it "the First Policy." As relevant here, the First Policy stated that "[r]eligious rituals such as baptism and wedding ceremonies will not be conducted for inmates." First Policy 7.07.17. According to Jarrard, Sharp told inmates that the Jail wouldn't permit baptisms because (1) baptism wasn't "necessary" (presumably, to their salvation), and (2) they could therefore wait to get baptized after their release.[2] In conjunction with the First Policy's issuance, Sharp also told Jarrard that he had to stop teaching about baptism if he wanted to remain in the program.

Jarrard attended a training about the First Policy and, in January 2017, he applied to resume his ministry. The Jail denied the application without explanation, although Moats later asserted that Jarrard was barred "not because of his insistence on baptizing inmates, but because of his disruptive behavior toward other members of the jail ministry program [who] did not share his radical

---

[2] Moats confirmed this rationale in a letter to Jarrard's counsel at the start of this litigation: "Our stance is since the Polk County Jail is a short term detention center, baptism can wait until after release since it is not a requirement for salvation."

religious views" and because Moats and his staff believed that Jarrard had "some mental health issues."

After his application was denied, Jarrard began a regular one-man vigil outside the Jail to protest his exclusion. On a few occasions, Moats and Sharp stopped to talk with Jarrard. Jarrard said that the conversations were cordial but always revolved around baptism and the officials' theological disagreement with Jarrard's views on the subject.

## C

Jarrard sued Moats and Sharp in federal court, seeking declaratory, injunctive, and monetary relief.[3] As relevant here, he alleged (1) that the Jail officials had retaliated against him for exercising his First Amendment rights by excluding him from the volunteer ministry program and (2) that the Jail's baptism ban itself violated the First Amendment.

Not long after Jarrard filed his complaint, Moats and Sharp implemented Jail Policy 5.23—the "Second Policy." The Second Policy provided that "[c]lergymen and religious advisors wishing to

---

[3] Deputy Dustin Strop was also a named defendant in the original complaint. As noted by the district court, defendant Strop's last name may actually be "Stroup." We'll follow the district court's lead and use the spelling in the case caption. The district court granted summary judgment to Strop on all counts against him, and Jarrard hasn't appealed that holding. Ollie Morris, a former inmate whose request to be baptized was denied, was originally a plaintiff alongside Jarrard, but he settled his claims against Moats and Sharp and is no longer in the case. Accordingly, we won't include any discussion of those two parties in the remainder of the opinion.

hold services or conduct programs in the jail" had to (1) "make written application to the Polk County Sheriff's Office with supporting documentation," (2) "attend a training session," and (3) "be approved by the Jail Administrator." Second Policy 5.23.II.F. The Second Policy didn't explain what an "application" should say or what "documentation" should accompany it, nor did it identify what criteria would inform the administrator's "approv[al]" determination or a timeline for that decision. Jarrard submitted an application under the Second Policy, but it was denied on the ground that he had "a history of being involved in contentious behavior and conflict" at other jails that he "did not fully disclose . . . in his application."[4]

Jarrard amended his complaint to address the denial of his application and, shortly thereafter, Moats and Sharp promulgated yet another policy—in particular, a revised Order Number 7.07. This "Third Policy" reiterated the ban on baptism and other religious rituals and amended the clergy-application requirements to include a "volunteer application" and a "background check[]." Third Policy 7.07.16, 7.07.18. But like its predecessor, the Third Policy didn't specify any criteria by which administrators would evaluate applications. Jarrard applied to be a volunteer under the Third Policy, but the Jail denied him again—this time on the

---

[4] Jarrard had noted in his application that he had been terminated or resigned from previous positions for "teaching inmates the purpose of baptism" and for "friction over an inmate baptism."

grounds that he was "not compliant with 501(c)3 standards"[5] and had been "dismissed from Floyd County Sheriff's Office and Cobb County Sheriff's Office Jail Ministry Programs."

Jarrard amended his complaint yet again—in relevant part, to address the Third Policy and the Jail's denial of his most recent application. In this second amended complaint—which serves as the operative complaint on appeal—Jarrard (1) reiterated his retaliation claim and separately (2) alleged that the Second and Third Policies impermissibly gave Jail officials unbridled discretion in evaluating applications. Jarrard sought minimal and/or nominal damages and an injunction on both claims.

Following discovery, the parties filed cross-motions for summary judgment. For his part, Jarrard sought partial summary judgment and a permanent injunction on his claim that the Second and Third Policies vested Moats and Sharp with too much discretion. Moats and Sharp sought summary judgment on all claims.

Not long after the summary-judgment motions were filed, Moats and Sharp revised Jail Order 7.07 *again*—the "Fourth Policy." For the first time, the Fourth Policy specified reasons that an applicant's request to join the volunteer ministry program could be denied. They "includ[ed] but [were] not limited to" the following— "[f]ailure to completely fill out the application, falsifying the application, failure to attend training, background concerns, failure to

---

[5] Because 26 U.S.C. § 501(c)(3) applies to "organizations," not individuals, we'll assume that the Jail meant that *Jarrard's church* wasn't compliant.

supply appropriate credentials . . . or any other characteristic that raises a reasonable probability that the applicant will be unsuitable for the volunteer ministry program." Fourth Policy 7.07.17. The Fourth Policy further indicated that applications would be reviewed on a first-come, first-served basis and that an applicant would receive a response within 30 days. *Id.* 7.07.18.

Given the revision, Jarrard amended his complaint to withdraw his request for injunctive relief pertaining to the Second and Third Policies. He didn't withdraw or otherwise modify either (1) his retaliation claim or (2) his damages claims pertaining to the Second and Third Policies.[6]

**D**

The district court granted summary judgment to Moats and Sharp across the board.

The court rejected Jarrard's First Amendment retaliation claim on the ground that he couldn't show that he had engaged in "constitutionally protected" speech. In so holding, the court first held that in his role as a volunteer minister, Jarrard was effectively a "government employee"—and, accordingly, that his retaliation claim was subject to the balancing test articulated in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563

---

[6] Although none of Jarrard's successive complaints expressly invoked 42 U.S.C. § 1983, the district court seems to have treated his claims for monetary damages as grounded in that statute, and Moats and Sharp haven't challenged that premise on appeal.

(1968), and its progeny.[7]  Applying that test, the court concluded (1) that Jarrard's ministry comprised "employee speech . . . not protected by the First Amendment," and (2) that even if his speech were that of a private citizen and not a government employee, it didn't address a "matter of public concern."  For both reasons, the court held, Jarrard's claim failed the *Pickering* test, meaning that his speech was not "constitutionally protected."  The court further concluded that even if the First Amendment protected Jarrard's speech, the law was insufficiently "clearly established" to override Moats and Sharp's assertion of qualified immunity.

With respect to Jarrard's challenges to the Second and Third Policies, the court acknowledged that they "arguably violated" Jarrard's First Amendment rights by giving "unbridled discretion" to those authorized to consider volunteer ministers' applications. Even so, the district court granted Moats and Sharp summary judgment on the ground that the law applicable to those challenges wasn't "clearly established," and that Moats and Sharp were thus entitled to qualified immunity.[8]

---

[7] *Pickering*'s primary progeny includes *Connick v. Myers*, 461 U.S. 138 (1983), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  For ease of reference, we will refer to the analytical framework that these cases created and applied as the *"Pickering"* test, analysis, etc.

[8] The district court opined in a footnote that Jarrard had abandoned his request for equitable relief against Moats and Sharp in their official capacities, either by withdrawing them or by not adequately reiterating them in the summary-judgment briefing.  *Jarrard v. Moats*, No. 4:20-CV-2-MLB, 2022 WL 18586257,

23-10332                Opinion of the Court                11

This is Jarrard's appeal.[9]

## II

On appeal, Jarrard contends that the district court erred in granting summary judgment against him on both (1) his claim that Moats and Sharp retaliated against him for his constitutionally protected speech and (2) his claim that the Second and Third Policies impermissibly granted Jail administrators too much discretion in evaluating applicants' requests to participate in the volunteer ministry program. We will address Jarrard's arguments in turn and will then separately evaluate the district court's determination that Moats and Sharp enjoy qualified immunity from suit.[10]

---

at *1 n.2 (N.D. Ga. Sept. 27, 2022). We disagree. As already explained, Jarrard withdrew his request for injunctive relief *with respect to his unbridled-discretion claim* after Moats and Sharp instituted the Fourth Policy. *See supra* at 9. But he never withdrew or otherwise modified *his retaliation claim*, with respect to which he has sought equitable relief from the start, and he vigorously litigated that claim at summary judgment. He didn't need to repeat expressly in his briefing that he wanted injunctive relief to keep that request alive.

[9] We review a district court's summary-judgment decision de novo, "drawing all inferences in the light most favorable to the non-moving party." *Sutton*, 64 F.4th at 1168 (quotation marks and citation omitted). Summary judgment is appropriate only "where there are no genuine issues of material fact," *id.*, and where "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[10] At the outset, we reject Moats and Sharp's contention that the Eleventh Amendment bars even injunctive relief against them in their official capacities. The nub of their argument seems to be that although *Ex parte Young*, 209 U.S. 123 (1908), generally permits a federal court to order state-government

## A

To make out a First Amendment retaliation claim, Jarrard has to show that "(1) [his] speech was constitutionally protected; (2) [he] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014) (quotation marks and citation omitted). The district court here granted summary judgment to Moats and Sharp because it held that Jarrard's claim failed the first, "constitutionally protected" requirement. Importantly for our purposes, in holding that

---

officials to comply with federal law, it doesn't authorize the court to compel a state official to exercise his "discretion" in a particular manner—here, they say, by having to "deal with a given volunteer on a recurrent basis." Br. for Appellees at 39. But *Ex parte Young* itself clarified that "[a]n injunction to prevent [a state officer] from doing that which he has no legal right to do is not an interference with [his] discretion." 209 U.S. at 159. Indeed, in the employment context—which, while not precisely applicable here for reasons we'll explain in text, is analogous—we have held that reinstatement is a permissible remedy against which the Eleventh Amendment poses no obstacle. *See Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014). That is so because even an employee who "could have been discharged for any reason or for no reason at all, . . . may nonetheless be entitled to reinstatement if [he] was discharged for exercising [his] constitutional right to freedom of expression." *Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987).

Jarrard's speech wasn't constitutionally protected, the court applied the *Pickering* test and concluded that Jarrard's claim failed it.[11]

We conclude, to the contrary, that on the particular facts of this case, *Pickering* doesn't provide the proper framework for determining whether Jarrard's speech was "constitutionally protected" and that, instead, Jarrard's claim should be evaluated under the "forum analysis" that traditionally governs speech-related claims. We further conclude that there is a genuine dispute of material fact about whether Moats and Sharp unconstitutionally barred Jarrard from the volunteer ministry program because they disagreed with his viewpoint concerning baptism. Accordingly, we will reverse the district court's determination that Jarrard's retaliation claim failed the threshold "constitutionally protected" prong and remand for that court to evaluate the adverse-conduct and causal-relationship prongs in the first instance.

**1**

In general, speech restrictions in government-owned spaces are subject to what courts have come to call a "forum analysis." In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, the Supreme Court specified three types of fora—in particular, what we've come to call "traditional public," "designated public," and "non-public"—and supplied standards governing what sorts of restrictions the

---

[11] Under *Pickering*, "for a government employee's speech to have First Amendment protection, the employee must have (1) spoken as a citizen and (2) addressed matters of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007).

government may constitutionally impose in each.  *See* 460 U.S. 37, 45–49 (1983).  A little more than a decade later, the Court added a fourth category: the "limited public forum." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  We needn't get into the details just yet; it's enough for now to say that forum analysis is the default means of evaluating speech restrictions.

*Pickering* and its progeny operate as an exception of sorts to the usual forum analysis in cases involving government employees. These employee-speech cases are subject to a different analysis because, as the *Pickering* Court explained, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  391 U.S. at 568.  In particular, the Court said, when the state is acting as an employer—as opposed to a regulator more generally—it has a special interest in "promoting the efficiency of the public services it performs through its employees." *Id.*

Jarrard, of course, wasn't technically a Polk County employee—he wasn't, that is, on the payroll.  Even so, he doesn't deny, as a general matter, that *Pickering* may be validly applied even to some individuals who aren't traditional government employees. Accordingly, it's not enough to say, as the district court did, that "courts have extended the application of the *Pickering* analysis to cover more than just traditional public employees."  The real and more granular question is whether, given the particulars of Polk County's volunteer ministry program and Jarrard's participation in

it, he was a de facto employee for *Pickering* purposes.  For the following reasons, we conclude that he was not.

First, and most importantly, *Pickering*'s logic doesn't comfortably apply to volunteer ministers like Jarrard.  As just explained, the rationale that underlies *Pickering*'s rule giving the government a freer hand in regulating the speech of its employees than that of ordinary citizens is that it has an important interest in ensuring the "efficien[t]" delivery of "public services." *Pickering*, 391 U.S. at 568; *see also, e.g.*, *Connick v. Myers*, 461 U.S. 138, 150 (1983) ("The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public."); *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.").  That rationale explains the circumstances in which the Supreme Court and this Court have extended *Pickering* beyond traditional employment relationships.  In applying the *Pickering* analysis to government contractors, for instance, the Supreme Court observed that "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).  So too, in extending *Pickering* to an unpaid political appointee to a public advisory board, we emphasized the government's interest "in

promoting the efficiency of the public services it performs." *McKinley v. Kaplan*, 262 F.3d 1146, 1149 & n.5 (11th Cir. 2001).[12]

This delivery-of-government-services rationale doesn't readily apply to Jarrard's participation in a volunteer prison ministry. Perhaps most importantly, providing religious instruction and pastoral care to inmates—quite unlike, say, collecting and removing trash, or, for that matter, perhaps even providing chaplains to servicemembers—is not a public service that the government has traditionally provided. Nor could it be, for that matter, without risking a violation of the Establishment Clause, which "mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104

---

[12] In support of its decision to apply *Pickering* here, the district court pointed to our unpublished decision in *Rodin v. City of Coral Springs*, 229 F. App'x 849 (11th Cir. 2007). There, without analyzing the issue, we applied the *Pickering* framework to volunteer firefighters. *Rodin* doesn't move the needle here for two reasons. First, and most obviously, it's unpublished, and thus non-precedential. Second, and in any event, applying the *Pickering* analysis there made some sense, in that fire protection is a service that has traditionally, even if not exclusively, been provided by the government. *See, e.g.*, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163 (1978) ("[T]here are a number of state and municipal functions . . . which have been administered with a greater degree of exclusivity by States and municipalities than has the function of so-called 'dispute resolution,'" including "such functions as education, fire and police protection, and tax collection."). And indeed, the underlying facts of *Rodin* made our assumption even more reasonable, in that the municipality there was in the process of converting its volunteer fire department into a "semi-professional one" comprising both volunteer and paid firefighters. 229 F. App'x at 850.

(1968)).  Moreover, and relatedly, in his position as a volunteer minister Jarrard didn't (and again, probably couldn't lawfully) advise Moats and Sharp or represent their interests with prisoners.[13]

Second, even setting aside *Pickering*'s logical underpinnings, Jarrard's participation in the ministry program doesn't bear any of the traditional hallmarks of employment.  For starters, although by no means dispositive, it's relevant that Jarrard wasn't paid (at least by the government) for the time he spent teaching and counseling inmates.  Moreover, recall that all Jarrard initially had to do to join the ministry program in 2012 was put his name on a list; to the best of his recollection, the Jail approved his so-called "application" within minutes.  And finally, quite unlike the typical job, the ministry program had no mandatory attendance policy—recall that no more than 10 of the 140-some-odd people on the sign-up list ever showed up.  In no practical respect did Jarrard's participation in the ministry program resemble a traditional government "job."

In reaching its contrary conclusion, the district court emphasized that under the Second, Third, and Fourth Policies, applicants like Jarrard signed the same confidentiality agreements that employees signed, executed waivers of liability, and underwent

---

[13] The out-of-circuit cases regarding volunteer government chaplains that the district court and Moats and Sharp cite don't change our thinking.  While it's true that both *Mustapha v. Monken*, 2013 WL 3224440 (N.D. Ill. June 25, 2013), and *Mayfield v. City of Oakland*, 2007 WL 2261555 (N.D. Cal. Aug. 6, 2007), applied *Pickering* to volunteer government chaplains, neither case assessed whether that was the proper analytical framework but, rather, seemed to take it as a given.

criminal history checks. Especially when weighed against the countervailing considerations that we've discussed, we aren't persuaded that these requirements made Jarrard a de facto employee for *Pickering* purposes. For one thing, the government imposes similar conditions on family members and friends who visit inmates, but of course that doesn't make them employees. And for another, we can't ignore the fact that Jarrard didn't have to do any of these things when he initially signed up to be a volunteer minister in 2012. We don't think there is any firm basis for concluding that although Jarrard wasn't initially a de facto employee, he later became one.

★　★　★

Because we conclude that neither *Pickering*'s theoretical underpinnings nor the practical realities of Jarrard's situation support the application of the *Pickering* analysis, we hold that the district court erred in evaluating Jarrard's claim under that framework. The proper approach, we conclude, is the usual forum analysis, to which we now turn our attention.

2

As already explained, the Supreme Court has specified four different types of fora to govern analysis of speech restrictions—public, designated public, limited public, and non-public. The parties here vigorously dispute whether the Polk County Jail's volunteer ministry program was a limited public forum, *see* Br. of Appellant at 18–19, or a non-public forum, *see* Br. of Appellees at 11, 29–30. We needn't resolve their dispute, because we find that a rule

common to *all* forums resolves the question whether, for purposes of Jarrard's First Amendment retaliation claim, his speech was "constitutionally protected"—namely, that any regulation of speech based on the speaker's viewpoint is presumptively invalid and must, at the very least, satisfy strict scrutiny, *i.e.*, it "must be the least restrictive means of achieving a compelling state interest." *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014) (traditional public); *see also Perry*, 460 U.S. at 46 (designated public); *Rosenberger*, 515 U.S. at 828–29 (limited public); *Perry*, 460 U.S. at 46 (observing that the government can regulate speech in a non-public forum "as long as the regulation . . . is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view").[14]

So, did Moats and Sharp engage in viewpoint discrimination when they denied Jarrard's application? They insist that they didn't, for two reasons, neither of which we find persuasive. First, they assert that, as a matter of fact, they didn't deny Jarrard's application because of his views on baptism, but rather because he had been (and they feared would be again) disruptive. For instance, in

---

[14] At times, the Supreme Court seems to have suggested that viewpoint-discriminatory speech restrictions are per se invalid. *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). At others, though, it has said that they are subject only (so to speak) to strict scrutiny. *See McCullen*, 573 U.S. at 478 (stating that if a state law discriminates on the basis of viewpoint, it must satisfy strict scrutiny). For present purposes, we'll assume that strict scrutiny applies.

denying Jarrard's application under the Second Policy, it noted that Jarrard had "a history of being involved in contentious behavior and conflict" and that he "did not fully disclose that history in his application." And its subsequent denial of Jarrard's application under the Third Policy mentioned his previous dismissal from two other jails' ministry programs. But given the procedural posture—recall that the district court granted Moats and Sharp summary judgment over Jarrard's opposition—we must construe the facts and make all reasonable inferences in Jarrard's favor. There is ample evidence that, if credited, indicates that Moats and Sharp disagreed with Jarrard's views on baptism, and it is reasonable to infer that they denied his applications on the basis of that disagreement. For instance, Jarrard's first meeting with Moats involved a discussion of their competing perspectives about baptism—and at the conclusion of that meeting Moats denied Jarrard request to rejoin the volunteer ministry program. So too, during the period when Jarrard was holding regular vigils outside the Jail to protest his exclusion from the program, Moats and Sharp repeatedly stopped to discuss baptism with him. And it seems that (at the very least) Moats's and Sharp's views about baptism affected other policy decisions at the Jail—including the decision to ban baptisms altogether—so it's reasonable to infer that those views affected their evaluation of volunteer applications as well. At most, Moats and Sharp's assertion that they had a valid, non-viewpoint-discriminatory motive creates factual dispute—which, of course, counsels against summary judgment, not in its favor.

Second, and separately, Moats and Sharp contend that even if their denial of Jarrard's application was due to his beliefs about baptism, their denial of his application would constitute "an appropriate *content-based* restriction of messages that significantly agitate inmates," as opposed to a viewpoint-based restriction. Br. of Appellees at 32. In support of their position, Moats and Sharp assert that they would also take issue with the following teachings: "(1) 'persons who *are* baptized through full immersion *will* go to Hell'; (2) 'persons with a tattoo(s) will go to Hell'; or (3) 'persons who take medications will go to Hell.'" *Id.* at 33. Moats and Sharp's examples, though, only undermine their position, inasmuch as they indicate that while they will permit discussions that don't mention Hell, or even of things that won't land one in Hell, they won't tolerate discussion of things that will result in damnation. That, it seems to us, is viewpoint discrimination, pure and simple.

At least for summary-judgment purposes, therefore, we conclude that Moats and Sharp engaged in viewpoint discrimination based on their disagreement with Jarrard's beliefs about baptism. We further conclude that their disapproval of his volunteer ministry application can't survive strict scrutiny. As already explained, Moats and Sharp assert that they denied Jarrard's applications for fear that his participation in the volunteer ministry program would "(1) tend to undercut inmate well-being and (2) unreasonably create problems for jail administrators." Even if we were to indulge those assertions despite the contrary evidence that Jarrard has put

22                    Opinion of the Court                    23-10332

forward,[15] and even assuming that they constitute compelling governmental interests, denying Jarrard's application was not the least restrictive means of achieving those ends.  As just one example, the Jail could have posted notices stating that Jarrard would be addressing a potentially contentious topic and let the inmates decide whether they wanted to attend; indeed, the Second Policy had contained a similar provision explaining that a deputy would escort from religious services any inmate not wishing to participate.  Second Policy, 5.23.II.H.  So too, they could have allowed other volunteer ministers to opt out of working with Jarrard so as to reduce the risk of contentious interactions.  And to the extent that they were worried about security issues related to the performance of baptisms, they could have instituted precautions to minimize them.  They could, for instance, have limited attendance at an inmate's baptism or required an inmate being baptized to be shackled throughout the process to reduce risk of escape.  There is no indication that Moats and Sharp attempted to take any such (or other similar) steps.

★   ★   ★

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . . religion."  *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  At least on the record as we must construe it, it seems that is what Moats and Sharp tried to do here by excluding

---

[15] We note that Jarrard performed two baptisms during his time at the Jail, and there is no indication that either caused any disturbance.

Jarrard from the ministry program. Because that exclusion violated Jarrard's "constitutionally protected" speech, we hold that Jarrard has met his burden under the first prong of the test that governs his First Amendment retaliation claim. Accordingly, we reverse the district court's contrary ruling and remand to allow that court to consider the "adverse conduct" and "causal relationship" prongs in the first instance. *See Brannon*, 754 F.3d at 1274.

## B

Jarrard separately argues that the Jail's Second and Third Policies violated the First Amendment because they provided no meaningful standards for the evaluation of volunteer ministry applications and thus impermissibly vested Jail administrators with "unbridled discretion." Although the district court found that the policies "arguably violated" the First Amendment, it nonetheless granted summary judgment to Moats and Sharp on the ground that the relevant law was insufficiently "clearly established" to overcome their qualified-immunity defense. For the reasons explained below, we hold that the Second and Third Policies did in fact violate the First Amendment. We'll address qualified immunity separately afterwards.

Under the First Amendment, a party can challenge a licensing rule on its face on the ground that it "vests unbridled discretion in a government official over whether to permit or deny expressive activity." *Tracy v. Florida Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 809 (11th Cir. 2020) (quotation marks and citation omitted); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988). This

"unbridled discretion" doctrine is grounded in the notion that "[e]xcessive discretion . . . is constitutionally suspect because it creates the opportunity for undetectable censorship and signals a lack of narrow tailoring." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1256 (11th Cir. 2004). To avoid those risks—and invalidation of its policy—a government entity must promulgate "narrowly drawn, reasonable, and definite standards to guide the official[decisionmaker's] decision." *Tracy*, 980 F.3d at 809 (quotation marks and citation omitted). So, for example, we held in *Burk* that a permit policy unlawfully granted municipal decisionmakers unbridled discretion because it required an individual seeking to hold a public demonstration to execute an indemnification agreement "in a form satisfactory to the [city's] attorney," but without in any way explaining the term "satisfactory." 365 F.3d at 1256; *see also Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1346–47 (11th Cir. 2024) (assuming without deciding that city's bus system's advertising space was a non-public forum and then holding that the city's advertising policy was unreasonable because it "fail[ed] to define key terms, lack[ed] any official guidance, and vest[ed] too much discretion in those charged with its application"). By contrast, in *Bloedorn v. Grube*, we held that a university policy regarding outside speakers' access and conduct adequately channeled administrators' decisionmaking because it limited—among other things—their discretion in determining the location and length of a speaker's presentation. 631 F.3d 1218, 1236–38 (11th Cir. 2011). In addition to these sorts of substantive standards, a government's policy should also include a "time limit within which

[an official] must make a decision on a permit application." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1222 (11th Cir. 2017).

"Our precedents recognize that the unbridled-discretion doctrine applies to prior restraints." *Id.* And although the term "prior restraint" calls to mind government officials censoring newspapers and magazines, *see, e.g.*, *Near v. Minnesota*, 283 U.S. 697 (1931), in fact it applies more broadly. We have explained the term in these words: "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *Barrett*, 872 F.3d at 1223 (quotation marks and citation omitted). In *Barrett*, for instance, we considered a policy that regulated whether and how citizens could obtain permission to speak during public-comment sessions of board-of-education meetings. We held that the policy, "although not formally a licensing or permitting scheme, [was] a prior restraint . . . because it *prevent*[*ed*] members of the public from speaking . . . unless they compl[ied] with the Policy's requirements." *Id.*

For similar reasons, the Jail's Second and Third Policies are subject to the unbridled-discretion doctrine. Both policies operated as prior restraints because they restricted would-be volunteer ministers from engaging in expression without government approval. Both needed, therefore, to entail "narrowly drawn, reasonable, and definite standards to guide" administrators'

decisionmaking.  *Tracy*, 980 F.3d at 809 (quotation marks and citation omitted).  They did not.[16]

The Second Policy's language pertaining to would-be-volunteer applications read as follows:

> Clergymen and religious advisors wishing to hold services or conduct programs in the jail must make written application to the Polk County Sheriff's Office with supporting documentation, attend a training session and then be approved by the Jail Administrator.

Second Policy 5.23.II.F.  The Third Policy stated:

> The Polk County Sheriff's Office encourages clergy from the community to minister to the inmates. Clergymen and religious advisors wishing to hold services or conduct programs in the jail must submit a volunteer application.  Members of the clergy allowed within the inner security perimeter or allowed contact visitation, must complete background checks, including the jail ministry program.

Third Policy 7.07.16.  Neither policy even attempts to provide the substantive standards resembling those that we found sufficient in *Bloedorn*.  Nor do they include a "time limit within which [an

---

[16] To be clear, it is of no particular moment that the Second and Third Policies weren't technically permitting schemes.  *See* Br. of Appellees at 31.  As *Barrett* makes clear, what matters is not a policy's formal designation or title, but rather its practical operation.

23-10332                Opinion of the Court                    27

official] must make a decision on a permit application." *Barrett*, 872 F.3d at 1222.

Moats and Sharp respond that the Second and Third Policies imposed sufficiently rigorous approval standards because "the Sheriff's Office used a detailed application form that provide[d] specific criteria for jail ministry volunteers." Br. of Appellees at 31. For example, under the Second Policy applicants had to provide contact information for their place of worship, a list of volunteer-related training and coursework in which they had participated, their volunteering history, and their general ministry plan. But the unbridled-discretion doctrine requires that a policy outline guidance for *decisionmakers*, not applicants. It may well be that an aspiring volunteer minister had to dot Is and cross Ts on his application, but nothing in either policy constrained the Jail administrators' decisions in reviewing his application. An applicant could check all the necessary boxes and yet, for reasons unknown, still have his application rejected. And that's a problem.[17]

---

[17] To be sure, we noted in *Bloedorn* that in an unbridled-discretion challenge, "[w]e consider the actual policies and practices employed by the [institution], not just the policy's text." 631 F.3d at 1237 (citing *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (explaining, in evaluating an unbridled-discretion claim, that "we must consider the [government's] authoritative constructions of the ordinance, including its own implementation and interpretation of it" (alteration in original))). That is to say, even if the face of a policy seems to vest administrators with unbridled discretion, its implementation history might demonstrate otherwise. On the record before us, there is no such implementation-history evidence, so we take the policies at face value.

Moats and Sharp further respond that Jarrard got a response regarding his 2020 application within two weeks and that the only reason he didn't get one regarding his latest application was because the ministry program had been suspended. *Id.* at 32. But again, they're missing the point. Even assuming that administrators returned Jarrard's 2020 application in a timely manner and had a good reason for not returning his more recent application, the problem remains: Nothing *required* administrators to respond, let alone in a timely fashion, to either application. Administrators could have sat on Jarrard's applications indefinitely without violating any rule embodied in either the Second or Third Policies. And again, that's a problem.

Because the Second and Third Policies contained neither any meaningful substantive guidance for Jail administrators' decisionmaking nor any timeline in which they had to respond, they violated the First Amendment's unbridled-discretion doctrine.

## C

Having concluded, at least for summary-judgment purposes, that Jarrard's speech was constitutionally protected and that the Second and Third Policies violated the unbridled-discretion doctrine, we turn to consider the question whether Jarrard's damages claims against Moats and Sharp are barred by qualified immunity. We hold that they are not.

### 1

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional

right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quotation marks and citation omitted). To enjoy qualified immunity's protection, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Id.* (quotation marks and citation omitted). The burden then shifts to the plaintiff to show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). We can consider the merits and clearly-established prongs in either order, and "an official is entitled to qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019).

All here agree that that Moats and Sharp were acting within their discretionary authority. And for reasons already explained, Moats and Sharp violated Jarrard's First Amendment rights (1) when they denied his applications for what the record as we must construe it indicates were viewpoint-discriminatory reasons, and (2) because the Second and Third Policies impermissibly vested administrators with unbridled discretion to approve or deny would-be volunteer ministers' applications. Accordingly, all that remains is to determine whether the law underlying Jarrard's claims was clearly established when these violations occurred. We conclude that it was, on both counts.

In determining whether a right was clearly established at the time an official acted, we ask "whether the contours of the right were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right." *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) (citing *al-Kidd*, 563 U.S. at 741). In this circuit, a plaintiff can meet his burden in any of three ways. He can either (1) come forward with "case law with indistinguishable facts clearly establishing the constitutional right," (2) point to "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right," or (3) show that officials engaged in "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.*[18]

---

[18] It appears that our journey to these three now-familiar "buckets" began in *Hope v. Pelzer*, 240 F.3d 975 (11th Cir. 2001), *rev'd*, 536 U.S. 730 (2002). We held there that although "the policy and practice of cuffing an inmate to a hitching post or similar stationary object for a period of time that surpasses the necessity to quell a threat or restore order is a violation of the Eighth Amendment," qualified immunity shielded the defendant officers from liability because the plaintiff couldn't point to existing decisions that were "'materially similar' to the facts" of his case. *Id.* at 980–81. On review, the Supreme Court criticized the "materially similar" facts requirement as a "rigid gloss on the qualified immunity standard" that "[was] not consistent with [that Court's] cases." *Hope*, 536 U.S. at 739. Chastened, we articulated in short order additional means by which a plaintiff would show clearly established law. In *Mercado v. City of Orlando*, we acknowledged that while a plaintiff could still bear his burden by "show[ing] . . . a materially similar case" that would give notice to police, he could also show that "a broader, clearly established principle should control the novel facts in this situation" or that his case "fits within the exception of

Needless to say, the first and third paths are narrow. Cases with genuinely "indistinguishable facts" are rare—and, in fact Jarrard doesn't even claim that any on-point, binding precedent would have put Moats and Sharp on notice that their conduct was unconstitutional. So too, circumstances in which we have found the third so-egregious-that-caselaw-is-unnecessary condition satisfied are few and far between. And that's not surprising, as a plaintiff trodding that path must show that a defendant's conduct "lies so obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1205 (11th Cir. 2012) (alteration in original) (quotation marks and citation omitted). Our decision in *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), exemplifies the level of outrageousness that we have required. There, an officer arrested a woman for committing a traffic violation and then—after handcuffing and securing her—walked her around to the back of her car and slammed her head against the trunk. *Id.* at 1191. We held that "no reasonable officer could have believed" that such "grossly disproportionate force" was legal. *Id.* at 1199. However objectionable Moats and Sharp's conduct, it doesn't rise to that level.

The second broad-principle category encompasses situations in which our case law has sufficiently established a constitutional right that every reasonable officer would know his conduct

---

conduct which so obviously violates that constitution that prior case law is unnecessary." 407 F.3d 1152, 1159 (11th Cir. 2005).

was unlawful despite the fact that we hadn't yet applied the principle to the specific facts of his case. Our recent decision in *Acosta v. Miami-Dade County*, 97 F.4th 1233 (11th Cir. 2024), is illustrative. Looking to a handful of existing cases, we held that the law clearly established that an arresting officer may not use gratuitous force on a non-resisting suspect who no longer poses a threat to the officer's safety. *Id.* at 1242 (collecting cases). Notably, we didn't parse out whether any of those cases involved indistinguishable facts or circumstances. Rather, we found the principle clearly established because we had affirmed it in a variety of situations. *See id.* That was enough to put the officers on notice that tasing and kicking a non-resisting suspect who was lying unconscious on the ground was unlawful. *See id.* at 1237, 1241–42.

**2**

So, did Moats and Sharp violate clearly established law when they denied Jarrard's applications (1) based on what we must assume (again, given the existing record and procedural posture) was their disagreement with his views about baptism, and (2) by applying the criteria-less Second and Third Policies? We hold that they did. Both Jarrard's right to be free from viewpoint discrimination and his right not to be subject to decisionmakers' unbridled discretion were clearly established—in particular, both were firmly grounded in "broad statement[s] of principle" expressly articulated in governing caselaw. *Prosper*, 989 F.3d at 1251.

With respect to the former, we (following the Supreme Court's unambiguous lead) have repeatedly affirmed that "[e]ven

23-10332               Opinion of the Court                    33

in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination—that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1321 (11th Cir. 2005); *see also, e.g.*, *Perry*, 460 U.S. at 46. Accordingly, no matter what kind of forum the Polk County Jail was, Moats and Sharp were—had to have been—on notice that excluding Jarrard from the volunteer ministry program based on his views about baptism was unlawful. And yet, given the facts as we must construe them, that's exactly what they did. Qualified immunity, therefore, does not shield Moats and Sharp from damages liability on Jarrard's First Amendment retaliation claim.[19] We reverse the district court's contrary conclusion.[20]

---

[19] Nor, of course, does qualified immunity shield Moats and Sharp from Jarrard's request for injunctive relief on his retaliation claim. *See Pearson v. Callahan*, 555 U.S. 223, 242–43 (2009) (observing that qualified immunity isn't available in "§ 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"). As already explained, *see supra* at 10 n.8, the district court erred when it concluded that Jarrard had abandoned his request for injunctive relief on the retaliation claim.

[20] Judge Rosenbaum would grant Moats and Sharp qualified immunity on the ground that "they were not on clear notice that *Pickering*"—rather than the usual forum analysis—"did not govern their decision." Rosenbaum Op. at 1. Her arguments are interesting and characteristically well-considered. Respectfully, though, we disagree. For starters, we don't think that a qualified-immunity doctrine that even pretends to real-world relevance can turn on whether line-level jail officials like Moats and Sharp had clear notice of a judge-created test called the "*Pickering* framework," *id*. at 1, 2, 6, or its application. Without casting any aspersions whatsoever, we rather doubt that Moats and

So too, the law has long been clearly established that decisionmakers like Moats and Sharp may not exercise unbridled discretion in deciding who can (and can't) speak. Our cases predating the promulgation of the Second and Third Policies make abundantly clear that any permitting-like scheme must entail both (1) substantive criteria to guide and cabin the decisionmakers' discretion and (2) a timeline specifying how long those decisionmakers have to respond to applications. *See, e.g., Burk*, 365 F.3d at 1256; *Bloedorn*, 631 F.3d at 1236–37; *Barrett*, 872 F.3d at 1222–23. Because the Second and Third Policies entailed neither safeguard, we hold that they violated Jarrard's clearly established First Amendment rights.[21]

---

Sharp have ever even heard of *Pickering* or the multistep balancing analysis that courts have fashioned around it—so surely neither of those can be the object of the notice required that modern qualified-immunity jurisprudence protects. Nor, for reasons we've tried to explain, could Moats and Sharp have reasonably thought, as a matter of fact, that Jarrard was a government employee—such that *Pickering* (whether or not they'd heard of it) would apply. When Jarrard initially joined the volunteer ministry program, all he had to do was put his name on a list. The jail never paid him. He had no set schedule. For that matter, there was no requirement (or even expectation) that he show up. To repeat: "In no practical respect did Jarrard's participation in the ministry program resemble a traditional government 'job.'" *Supra* at 17.

[21] Contrary to the district court's suggestion, we don't think that *Barrett* is off-point for the reason that it involved a limited public forum rather than a non-public forum. *Barrett* "identified viewpoint discrimination as a particular evil with which we were concerned" in adjudicating unbridled-discretion claims, 872 F.3d at 1226, and as we have already explained, viewpoint discrimination is unlawful even in non-public fora. We also highlighted in *Barrett* that we had

23-10332                Opinion of the Court                35

⋆  ⋆  ⋆

Because the law clearly established Jarrard's constitutional rights to be free from viewpoint discrimination and not to be subject to a permitting-like scheme that vested decisionmakers with unbridled discretion, we hold that the district court erred in granting summary judgment to Moats and Sharp.  Accordingly, we reverse those parts of the district court's opinion.

We **REVERSE** the district court's decision and **REMAND** the case for further proceedings consistent with this opinion.

---

previously applied the unbridled-discretion doctrine in the context of an airport, the quintessential non-public forum, because of the risk of latent viewpoint discrimination. *Id.* at 1225 (discussing *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298 (11th Cir. 2003)).

23-10332          ROSENBAUM, J., Dissenting in Part          1

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

I join all but Part II-C-2 of the Majority Opinion. I write separately because I would affirm the part of the district court's order concluding that Defendants Sheriff Johnny Moats and Chief Deputy Al Sharp are entitled to qualified immunity. To reach its contrary conclusion, the Majority Opinion necessarily first finds that participants in the Polk County Jail volunteer ministry program, like Plaintiff Stephen Jarrard, do not act as government employees, so the framework that *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), establishes does not apply to him. That conclusion may well be correct. But by itself, it's not enough to overcome Moats and Sharp's qualified-immunity defense.

Even if the Majority Opinion is right that the *Pickering* framework doesn't apply here, it has identified no precedent that clearly established that a volunteer prison chaplain does not act as a government employee. Yet as the Majority Opinion acknowledges, other courts have applied the *Pickering* framework to volunteer prison chaplains. The upshot of this is that when Moats and Sharp declined to allow Jarrard to participate in the program, they were not on clear notice that *Pickering* did not govern their decision. And if *Pickering* did control, its framework did not clearly establish that Moats and Sharp violated Jarrard's First Amendment rights.

The Majority Opinion fails to explain how Supreme Court or our precedent would have made it clear to every competent jail

official that Jarrard wasn't a government employee and was thus not subject to the *Pickering* framework. I can't find precedent from the time of Moats and Sharp's actions that clearly establishes that, either. For this reason, I respectfully dissent.

I divide my discussion into two substantive parts. Section I explains why the law did not clearly establish that a volunteer jail chaplain in the program here did not act as a government employee and so was not subject to the *Pickering* framework. And Section II shows that, under *Pickering*, it was not clearly established that Moats and Sharp's decisions not to allow Jarrard to participate violated the First Amendment.

**I.**

The qualified-immunity doctrine seeks to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To resolve this balance, the doctrine protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (cleaned up).

The "clearly established" component has the effect of shielding from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

23-10332          ROSENBAUM, J., Dissenting in Part          3

A plaintiff may show that the law was clearly established at the time of the conduct in one of three ways: he "must point to either (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)).

But to satisfy this burden, in our Circuit, a plaintiff must point "to binding decisions of the Supreme Court of the United States, this Court, [or] the highest court of the relevant state" (here, Georgia). *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018). Precedent from other jurisdictions cannot clearly establish the law in our Circuit. *Gilmore v. Ga. Dep't of Corr.*, 111 F.4th 1118, 1135–36 (11th Cir. 2024).

And we judge whether the law was clearly established by looking to the law at the time of the official's act, not as the law has developed since that time. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In sum, "[i]f objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996).

That's the case here. When Moats and Sharp declined to allow Jarrard to participate in the program, the law wasn't clear that their refusal violated his First Amendment rights. To begin

4                    ROSENBAUM, J., Dissenting in Part            23-10332

with, Jarrard faced an uphill battle.  We've said that "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context."  *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017) (collecting cases).  After all, First Amendment claims are usually intensely fact-specific.

So I turn to the specific problem here.  A plaintiff who claims a violation of his First Amendment rights must show that his speech is "constitutionally protected."  *Brannon v. Finkelstein*, 754 F.3d 1269, 1274 (11th Cir. 2014) (quoting *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011)).  And to be sure, the First Amendment presumptively protects many areas of expression.  *See United States v. Stevens*, 559 U.S. 460, 468 (2010).

But it does not presumptively protect a government employee's speech.  *See Pickering*, 391 U.S. at 568.  That's because the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Id.*

So we apply a two-step framework that balances the state's interest in effective governance against its employees' interest in exercising their First Amendment rights.  *See Alves v. Bd. of Regents*, 804 F.3d 1149, 1159–60 (11th Cir. 2015) (explaining the framework).  Of course, we apply *Pickering* only if the plaintiff is a government employee.  But as the Majority Opinion acknowledges, the definition of a government employee is not exactly clear-cut.  *See* Maj. Op. at 14–15, 17–18.

23-10332          Rosenbaum, J., Dissenting in Part          5

Jarrard's damages claim succumbs to qualified immunity because he can point to neither "case law with indistinguishable facts" nor "a broad statement of principle within the Constitution, statute, or case law" that directs us to disregard *Pickering*'s framework.[1] *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (quoting *Lewis*, 561 F.3d at 1291–92). And because *Pickering* resolves whether speech is constitutionally protected in the first place, failure to dispel its application or prevail under its framework through clearly established law dooms both Jarrard's retaliation and unbridled-discretion claims.

No "broad statement of principle" identifies who is a government employee for purposes of *Pickering*. We have noted that "courts have extended the application of the *Pickering* analysis to cover more than just traditional public employees"—that is, more than "a traditional salaried public employee." *McKinley v. Kaplan*, 262 F.3d 1146, 1149 n.5 (11th Cir. 2001). But we have not offered a clear rule to help courts determine the outer bounds of *Pickering*'s exception. Rather, we have explained that *Pickering* cases are "intensely fact-specific and do not lend themselves to clear, bright-line rules." *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000) (quoting *Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998)).

---

[1] No one suggests that the conduct here was "so egregious that a constitutional right was clearly violated, even in the total absence of case law," *Perez*, 809 F.3d at 1222. *See* Maj. Op. at 31 ("However objectionable Moats and Sharp's conduct, it doesn't rise to that level.").

Indeed, courts have applied the *Pickering* framework to plaintiffs who are not, in fact, employed by the government—including to government volunteers. Take *Versage v. Township of Clinton*, 984 F.2d 1359 (3d Cir. 1993). There, a member of a volunteer fire department alleged violations of his First Amendment rights when the city terminated his relationship with the fire department in retaliation for speech he had engaged in. *Id.* at 1364. The Third Circuit applied the *Pickering* framework to evaluate the volunteer's claim. *See id.* It reasoned that "similar First Amendment concerns [that apply in a government-employee situation] would apply in a volunteer context." *Id.*

Other courts have likewise applied the *Pickering* framework to volunteers' First Amendment claims. *See*, *e.g.*, *LeFande v. District of Columbia*, 841 F.3d 485, 488 (D.C. Cir. 2016) (applying *Pickering* to First Amendment claim of Metropolitan Police Department Reserve Corps volunteer, an unpaid volunteer who assisted full-time officers of the Metropolitan Police Department in providing law-enforcement services); *Janusaitis v. Middlebury Vol. Fire Dep't*, 607 F.2d 17, 18, 25 (2d Cir. 1979) (applying *Pickering* to volunteer firefighter's First Amendment claim); *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 339, 351–56 (4th Cir. 2000) (applying *Pickering* to volunteer firefighter's First Amendment claim); *Harnishfeger v. United States*, 943 F.3d 1105, 1109, 1113–19 (7th Cir. 2019) (applying *Pickering* to Volunteer in Service to America (VISTA) volunteer's First Amendment claim); *Shands v. City of Kennett*, 993 F.2d 1337, 1340, 1342–48 (8th Cir. 1993) (applying *Pickering* to First Amendment claims of volunteer firefighters); *Hyland v. Wonder*, 972 F.2d

1129, 1132, 1136–40 (9th Cir. 1992) (applying *Pickering* to probation-department volunteer's First Amendment claim).

And at least two district courts have applied *Pickering* to volunteer chaplains specifically. *See, e.g.*, *Mustapha v. Monken*, 2013 WL 3224440, at ⋆1, ⋆7–8 (N.D. Ill. June 25, 2013) (applying *Pickering* to a volunteer chaplain for the state police); *Mayfield v. City of Oakland*, 2007 WL 2261555, at ⋆1, ⋆4–6 (N.D. Cal. Aug. 6, 2007) (applying *Pickering* to volunteers for city's volunteer police chaplaincy program).

True, as the Majority Opinion notes, *see* Maj. Op. at 17 n.13, many of these cases took for granted that *Pickering* applied. But that doesn't help Jarrard. If all these courts at least implicitly believe that *Pickering* governs the analysis when it comes to government volunteers, it's hard to see how it could have been clearly established that *Pickering* does not apply here.

The Majority Opinion says Jarrard couldn't have been a government employee because the point of the Jail's program was to provide religious instruction and pastoral care to prisoners—an area forbidden for the government. *Id.* at 16–17. And though that makes some sense, courts have applied *Pickering* to full-time government chaplains or ministers. *See, e.g.*, *Donahue v. Staunton*, 471 F.2d 475, 479 (7th Cir. 1972); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986); *Akridge v. Wilkinson*, 178 F. App'x 474, 476, 481 (6th Cir. 2006). So I don't see how the Majority Opinion's point in this respect clearly establishes that *Pickering* doesn't apply to government chaplains (salaried or voluntary).

Plus, the government provides the public service of running the jails. A big part of that is maintaining order and security. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (explaining jail "administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Yet within those confines, jails also must allow prisoners to practice their religion. Because a jail's authority extends to both, it enjoys some discretion to strike the necessary balance between them. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). And at the very least, a sheriff or deputy sheriff could reasonably believe, within limits, that the jail's discretion reaches further than it does.

In the end, the Majority Opinion's determination that *Pickering* doesn't apply comes down to the weighing of what it describes as the "particulars of Polk County's volunteer ministry program and Jarrard's participation in it." Maj. Op. at 14–15. And that's the problem. As the Majority Opinion readily concedes, some facts suggest that Jarrard could be an employee. For instance, the Majority Opinion acknowledges that Jarrard and other applicants "signed the same confidentiality agreements that employees signed, executed waivers of liability, and underwent criminal history checks." *Id*. at 17–18. Not only that, but the program involved interacting with prisoners. So complying with security measures was not optional.

23-10332          ROSENBAUM, J., Dissenting in Part          9

The point here is that, ultimately, it makes no difference to the "clearly established" analysis whether we weigh these "particulars of Polk County's volunteer ministry program and Jarrard's participation in it" to determine Jarrard was not an employee and therefore not subject to *Pinkering*. All that matters is whether this answer was clearly established to Moats and Sharp at the time of their actions. And I just don't see how, given the legal landscape I've described, we can say it was.[2] *See Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) ("Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.'" (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978)).

---

[2] The Majority Opinion asserts that *Pickering* couldn't have muddied the waters on what the Majority Opinion says was clearly established law because the Majority Opinion "rather doubt[s] that Moats and Sharp have ever even heard of *Pickering* or the multistep balancing analysis that courts have fashioned around it." *See* Maj. Op. at 33 n.20. But the Supreme Court long ago "purged qualified immunity doctrine of its subjective components." *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985). In other words, binding Supreme Court precedent makes "the defendants' actual state of mind or knowledge of the law . . . irrelevant to whether the asserted conduct would have been legally reasonable." *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015). So the question we must ask is not what Moats and Sharp knew about the governing law but whether the governing law clearly established that Jarrard was not a government employee so that the *Pickering* framework would not apply. And for the reasons that I've explained, and that the Majority Opinion fails to rebut, the answer is that the law was not clearly established.

## II.

Because Jarrard has not pointed to clearly established law that directs us to disregard Defendants' *Pickering* analysis, we must consider whether Jarrard can prevail under a clearly established application of *Pickering*. He can't.

A government employee must prevail under our two-step *Pickering* framework to establish a First Amendment claim. At the first step, we undertake a "threshold inquiry": we consider whether the employee spoke "(1) as a citizen and (2) on a matter of public concern." *Alves*, 804 F.3d at 1160. If so, then we proceed to the second step. At that step, we ask "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" by balancing the "public and private interests articulated in *Pickering*." *Id.* at 1159–60 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If the employee prevails at both steps, then the First Amendment protects the employee's speech, and we proceed to the merits of his claim. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).

As I've noted, plaintiffs can struggle to pierce qualified immunity's shield when *Pickering* controls. First Amendment cases seldom produce "a broader, clearly established principle that should control the novel facts of the situation" or situations that "so obviously violate the constitution that prior case law is unnecessary." *Gaines*, 871 F.3d at 1209 (quoting *Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012)). Plaintiffs usually must "produce a

23-10332          ROSENBAUM, J., Dissenting in Part          11

case in which speech materially similar to [theirs] in all *Pickering-Connick* respects was held protected." *Maggio*, 211 F.3d at 1354–35 (quoting *Martin*, 141 F.3d at 1420).

This case does not defy that pattern. Here, we can't say that no reasonable person could conclude that Jarrard didn't speak as a citizen (but as a government employee) on a matter of public concern. *See* Maj. Op. at 31. And Jarrard identifies no case clearly establishing a broad principle that controls *Pickering*'s inquiry here. So Jarrard can win only by producing a "binding decision[] of the Supreme Court of the United States, this Court, [or] the highest court of the relevant state" (here, Georgia), *Glasscox*, 903 F.3d at 1217, with materially similar facts that establishes each of element of *Pickering*'s framework—(1)(a) that Jarrard spoke as a citizen; (1)(b) that he spoke on a manner of public concern; and (2) that the balance of interests weighs in his favor.

He did not do so. I begin with *Pickering*'s first step.

Jarrard argues that we can skip that step because free-exercise claims are not subject to *Pickering*'s threshold inquiry (whether he spoke as a citizen on a matter of public concern). But once again, even if that's so, Jarrard doesn't show that it's clearly established. The Supreme Court recently recognized that the question "whether the Free Exercise Clause may sometimes demand a different analysis at the first step of the *Pickering-Garcetti* framework" has not yet been answered. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531 n.2 (2022). In other words, it is not clearly established that

we can skip *Pickering*'s first step when the claim at issue involves religious speech, like Jarrard's does.

And neither of the Eleventh Circuit cases that Jarrard points to clearly establishes that proposition, either.[3]  In *Watts v. Florida International University*, 495 F.3d 1289, 1299 (11th Cir. 2007), we expressed "no view on the ultimate merits, or lack of merit," of the free-exercise claim—including on the applicability of *Pickering*'s first step.  We concluded only that Watts adequately pled his sincere religious beliefs.  *Id.* at 1294–99.  So *Watts* does not help Jarrard.

And in *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1286 (11th Cir. 2012), we explained that *Pickering* governed Walden's free-exercise claim.  That said, we didn't apply *Pickering* because Walden could not provide any evidence that the defendants burdened her sincerely held religious beliefs.  *Id.*

Put simply, neither panel had reason to grapple with whether we can skip *Pickering*'s first step, so those cases do not clearly establish that we skip *Pickering*'s first step when a free-exercise claim is involved.  *See Loggins v. Thomas*, 654 F.3d 1204, 1222 (11th Cir. 2011) (applying 28 U.S.C. § 2254(d)(1) and noting that implications and dicta cannot "clearly establish federal law").

---

[3] Jarrard also cites *Meriwether v. Hartop*, 992 F.3d 492, 504–17 (6th Cir. 2021), but that case cannot clearly establish the law in this Circuit for purposes of qualified immunity.  *Gilmore*, 111 F.4th at 1135–36.

Because Jarrard has not shown that it was clearly established that we skip the first step in the *Pickering* analysis when a free-exercise claim is involved, Jarrard must show that it was clearly established under both *Pickering* steps that Moats and Sharp could not decline Jarrard's application.  But Jarrard fails to show under clearly established law that he spoke as a citizen on a matter of public concern.  So I do not proceed to *Pickering*'s second step.

1. *At the time of Moats and Sharp's actions, it was not clearly established that Jarrard spoke as a private citizen.*

First, we ask whether Jarrard spoke as a private citizen or in his capacity as a government employee.  Speech is not protected if it "owes its existence to a public employee's professional responsibilities" or was made "pursuant to" those responsibilities.  *Garcetti*, 547 U.S. at 421; *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").  The inquiry is practical.  *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009) (citing *Garcetti*, 547 U.S. at 424).  Formal job descriptions are informative but do not control, *id.*; "[w]e have consistently discredited narrow, rigid descriptions of official duties urged upon us to support an inference that public employees spoke as private citizens," *id.* at 1284.  Rather, we review the record as a whole to determine whether Jarrard spoke as a citizen or as a government employee.  *See Garcetti*, 547 U.S. at 424–25.

And that poses a problem for Jarrard.  Once again, we deal with a fact-bound inquiry.  So Jarrard must identify a "case in which

speech materially similar to [his] was held" to be conducted as a citizen, *Maggio*, 211 F.3d at 1355, or which set forth a broad principle leading us to that conclusion, *Gains*, 871 F.3d at 1209. He has not done so.

For instance, Jarrard relies on and *Cambridge Christian School v. Florida High School Athletic Association* ("*Cambridge Christian I*"), 942 F.3d 1215, 1232 (11th Cir. 2019), and *Gundy v. City of Jacksonville*, 50 F.4th 60, 79 (11th Cir. 2022), to suggest that Jarrard did not speak as an employee. But both are irrelevant because we published them after Moats and Sharp denied Jarrard's application to resume his ministry in the Jail in 2017. So they could not have put Moats and Sharp on notice. *See Harlow*, 457 U.S. at 818.

And even considering those cases, they couldn't have put Moats and Sharp on notice that any religious speech Jarrard engaged in as part of the program necessarily would not have qualified as speech in Jarrard's capacity as a government employee under *Pickering*. Both *Cambridge Christian I* and *Gundy* addressed whether a non-employee's speech could be construed as government speech. *See Cambridge Christian I*, 942 F.3d at 1222 (private schools speaking over loudspeaker at state-operated football game); *Gundy*, 50 F.4th at 64 (legislative invocation given by an invited, guest speaker before the opening of a Jacksonville City Council meeting). Neither even mentioned *Pickering* or its framework. And neither asked whether the speaker acted under their official duties. Instead, we applied a separate test that balanced three factors—"history, endorsement, and control"—to determine whether, based on

totality of the circumstances, the non-employee's speech amounted to government speech. *Cambridge Christian I*, 942 F.3d at 1230, 1236; *Gundy*, 50 F.4th at 76. So these cases and the test they applied couldn't have clearly established how *Pickering* applies.

The most apt case Jarrard cites is *Hubbard v. Clayton County School District*, 756 F.3d 1264, 1268 (11th Cir. 2014). But it doesn't get him where he needs to be, either. There, we determined that Hubbard did not make the relevant statements "as an employee of the School District" because he was "on leave from the School District" and away from his school at the time he made the remarks. *Id.* at 1267. He instead spoke, we said, "in his capacity as president of" the Georgia Association of Educators. *Id.* But unlike Hubbard, who clearly spoke outside his capacity as a government employee, Jarrard sought to make his statements while actively ministering in the government program. So *Hubbard* provided no guidance to Moats and Sharp and did not clearly establish that their actions violated Jarrard's rights.

That leaves Jarrard with only the broad claim that no reasonable person who observed Jarrard speak would believe he conveyed a religious message on the government's behalf. But our case law does not establish the principle "so clear[ly] and broad[ly] (and 'not tied to particularized facts')," *Gains*, 871 F.3d at 1209 (citation omitted), that religious speech can never qualify as government speech. In fact, as recently as September 3, 2024, in our follow-up to *Cambridge Christian I*, we concluded that a 30-second religious address by a high school at the Florida High School Athletic Association's

state football championship qualified as "government speech." *Cambridge Christian Sch. v. Fla. High Sch. Athletic Ass'n* ("*Cambridge Christian II*"), ___ F.4th ___, 2024 WL 4018866, at *20 (11th Cir. Sept. 3, 2024). Not only that, but the fact that the government may violate the Establishment Clause also shows that religious speech may be government speech. *See, e.g.*, *Engel v. Vitale*, 370 U.S. 421, 430 (1962). Plus, that government chaplains have official responsibilities they may speak under further shows that the government is capable of engaging in religious speech. *See Baz*, 782 F.2d at 709 (rejecting the argument that the V.A. violated "the First Amendment when it took steps to 'limit and restrict the manner in which the Plaintiff could pray with patients, preach, and also limited the content of his sermons'"). Put simply, these First Amendment questions are contextual. *See Garcetti*, 547 U.S. at 424 ("The proper inquiry is a practical one."); *Cambridge Christian I*, 942 F.3d at 1230 (balancing "history, endorsement, and control" factors). And when "case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (citation omitted).

For these reasons, when Moats and Sharp rejected Jarrard, it was not clearly established that any speech Jarrard would have engaged in as part of the Jail's program would not have been in his

23-10332        ROSENBAUM, J., Dissenting in Part          17

official capacity.  So Moats and Sharp are entitled to qualified immunity.

> 2.  *At the time of Moats and Sharp's actions, it was not clearly established that Jarrard spoke on a matter of public concern.*

Next, we ask whether Jarrard spoke on a matter of public concern.  "Speech is considered to deal with a matter of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"  *United States v. Fleury*, 20 F.4th 1353, 1364 (11th Cir. 2021) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  In undertaking this inquiry, we consider the "content, form, and context" of a government employee's speech.  *O'Laughlin v. Palm Beach County*, 30 F.4th 1045, 1051 (11th Cir. 2022).  Content is "the most important factor."  *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1284 (11th Cir. 2006).  But again, we review "the record as a whole."  *Id.* at 1286.

Jarrard argues that religious speech is inherently of public concern, and, even if it isn't, the circumstances of Jarrard's ministry confirm that he spoke on a matter of public concern.[4]  But yet

---

[4] Defendants cite the district court's conclusion that Jarrard abandoned the argument in the district court.  I disagree.  Jarrard's "public concern" argument, though brief, was not "perfunctory" or "without supporting arguments." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).  It gave Defendants sufficient notice and opportunity to respond.  Jarrard also argued each element within the *Pickering* framework, so we can consider each

18                    ROSENBAUM, J., Dissenting in Part            23-10332

again, Jarrard cites no "binding decision[] of the Supreme Court of the United States, this Court, [or] the highest court of the relevant state" (here, Georgia), *Glasscox*, 903 F.3d at 1217, clearly establishing those propositions.

Jarrard rightfully points out that the "public concern requirement exists because that category of expression is at the core of the First Amendment's protections." *Grigley v. City of Atlanta*, 136 F.3d 752, 755 (11th Cir. 1998). But he offers no case that both binds us and applies that principle to religious speech. True, some of our sister circuits have held that religious speech is of inherent public concern. *E.g. Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011); *see also Brown v. Polk Cnty.*, 61 F.3d 650, 658 (8th Cir. 1995); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (listing "religion" among "topics [that] plainly touched on issues of public, rather than private, concern"). But our sister circuits' opinions do not clearly establish law in the Eleventh Circuit. *Gilmore*, 111 F.4th at 1135–36.

And even if they could, it's not clear that a "robust consensus" of them, *District of Columbia v. Wesby*, 583 U.S. 48, 65 (2018), supports the proposition that religious speech inherently, rather than contextually, addresses a matter of public concern. For instance, Jarrard cites *Scarbrough v. Morgan County Board of Education*, 470 F.3d 250, 257 (6th Cir. 2006). But there, the Sixth Circuit concluded that Scarbrough's religious speech "touch[ed] on a matter

component of it, even if Jarrard's district-court briefing as to one of them was limited.

23-10332          ROSENBAUM, J., Dissenting in Part          19

of public concern, *given its content, form, and context*." *Id.* (emphasis added).  Content was not dispositive.

Plus, other circuits have applied the usual, holistic analysis and concluded, despite the religious content of the speech at issue, that the plaintiff did not address a matter of public concern.  *See Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir. 2001) ("Although personal religious conviction . . . obviously is a matter of great concern to many members of the public, in this case it simply is not a matter of 'public concern' as that term of art has been used in the constitutional sense.").  In sum, no broad, general principle clearly establishes that Jarrard necessarily spoke on a matter of public concern simply because his speech involved religious matters.

So Jarrard had to produce a materially similar case to his that clearly established his religious speech was of public concern.  *See Maggio*, 211 F.3d at 1354–55.  He did not do so.  None of the binding cases from 2017 or earlier that Jarrard cites addresses whether religious speech necessarily touches on a matter of public concern.  *See, e.g.*, *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1317 (11th Cir. 2005) (safety of children in school); *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 916 (11th Cir. 1993) (pre-leasing practices and maintenance problems in Atlanta Housing Authority buildings); *Rankin v. McPherson*, 483 U.S. 378, 386 (1987) (policies of the President's administration); *Grigley*, 136 F.3d at 753 (pursuing criminal charges).  And none of them confronted speech in a jail or prison setting.  *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 140 (1983) (district

attorney's office); *Mitchell*, 468 F.3d at 1280 (county commissioner hearing).

The First Amendment questions that Jarrard's circumstances (religious speech to inmates) present are ultimately novel for this Court. So we cannot say that Moats and Sharp reasonably should have "predict[ed]—at the time [of] the[ir] official acts"—that Jarrard spoke on a matter of public concern without "await[ing] full adjudication" by us. *Foy*, 94 F.3d at 1534. And as a result, they are entitled to qualified immunity. *See id.*

★ ★ ★

At bottom, Moats and Sharp assert that Jarrard was a government employee whose speech fell within the scope of his employment as a government minister. In other words, they argue that Jarrard did not engage in any constitutionally protected speech. They may very well be wrong about that. But that's not the relevant question on a qualified-immunity inquiry. And neither Jarrard nor the Majority Opinion has pointed to any law that clearly established that as of 2017. So Moats and Sharp are entitled to qualified immunity. For that reason, I would affirm the district court's grant of summary judgment in their favor on that issue.